**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 0:17-cv-62317-JIC

BBX CAPITAL CORPORATION, formerly BankAtlantic
Bancorp, Inc.,

       Plaintiff,

vs.

FEDERAL DEPOSIT INSURANCE CORP., in its
corporate capacity, and BOARD OF GOVERNORS OF
THE FEDERAL RESERVE BOARD

       Defendants.

_____/

**AMENDED COMPLAINT**

Eugene E. Stearns
Grace L. Mead
Jenea M. Reed
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 3

JURISDICTION AND VENUE .......................................................................... 9

PARTIES ............................................................................................................. 9

SATISFACTION OF CONDITIONS PRECEDENT ...........................................11

BANKING STATUTES, AGENCY REGULATIONS, AND INTERPRETIVE GUIDANCE ........................................................................................................12

FACTS ...............................................................................................................15

    A.    BBX's Contractual Obligations to Pay Severance and the Federal Agencies' Wrongful Actions ...........................................................15

            1.    The Stock Purchase Agreement and the Banking Agencies' Approval of the Sale of BankAtlantic. ...................................................15

            2.    The Banking Agencies' Misclassification of the Severance Payments. ...............17

            3.    BBX's Severance Applications to make payments to five former BankAtlantic Executives. ...................................................19

            4.    BBX's Severance Applications to make payments to three additional former BankAtlantic Executives ...................................................21

            5.    BBX Is Forced to Sue the Banking Agencies .....................................22

    B.    The Record Before the Agency Compels the Conclusion that BBX is Entitled to Make the Full Severance Payments. ...........................................25

            1.    BBX and BankAtlantic's Management Set the Standard for Disclosure, Credit Management, and Capital Management in Unprecedented Market Conditions. ...................................................25

                    a.    BankAtlantic's Pre-Crash Lending Practices ............................26

                    b.    The Market Collapse ............................26

                    c.    BankAtlantic's Response to the Crash ............................28

            2.    BankAtlantic's Management Successfully Navigated the Financial Crisis and the Great Recession. ...................................................31

3.      BankAtlantic's Management Successfully Negotiated, Structured, and Closed a Transaction that Removed BBX from the Banking Business without Costing the Government a Penny. .......................................32

4.      Recent Developments Confirm that BankAtlantic's Management Outperformed Their Peers. ...................................................................34

C.    The FDIC Has Unreasonably, Arbitrarily, and Capriciously Reduced Contractual Severance Payments Owed to Five Former BankAtlantic Executives ............................................................................................36

1.      Lloyd DeVaux—Chief Operating Officer ...........................................36

2.      Jay McClung—Chief Risk Officer ....................................................38

3.      Susan McGregor—Chief Talent Officer ............................................40

4.      Lewis Sarrica—Chief Investment Officer..........................................40

5.      Valerie Toalson—Chief Financial Officer .........................................42

D.    The FDIC Has Unreasonably Withheld or Unreasonably Delayed Approval of Contractual Severance Payments Owed to Three Former BankAtlantic Executives ............................................................................................43

1.      Alan B. Levan—Chair and Chief Executive Officer ............................44

2.      John ("Jack") Abdo—Vice Chair .....................................................45

3.      Jarett S. Levan—Chief Executive Officer .........................................46

COUNT I—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT .......................48

COUNT II—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT ......................49

COUNT III—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT....................50

COUNT IV—DUE PROCESS VIOLATIONS.........................................................52

COUNT V—DECLARATORY RELIEF ................................................................53

PRAYER FOR RELIEF ....................................................................................53

## INTRODUCTION

1.     Plaintiff BBX Capital Corporation seeks declaratory and injunctive relief against two banking agencies—the Federal Deposit Insurance Corporation and the Federal Reserve Board of Governors—for arbitrary and capricious agency action, for unlawfully withholding and delaying agency action, and for violating BBX's due process rights.

2.     BBX is entitled to make severance payments to former bank executives who—during the Great Recession—negotiated, structured, and closed the sale of a Florida bank that allowed investors in the bank holding company BBX to preserve their equity, avoided any risk to the bank's depositors, and did not cost the federal government a penny.

3.     BBX's obligation to pay severance to several former executives arose in 2012 at the closing of the sale of BBX's banking subsidiary, BankAtlantic, to BB&T Corporation. The November 2011 Stock Purchase Agreement between BBX and BB&T, as amended, required BBX to exit the banking business and pay BankAtlantic's executive management severance, which would then be reimbursed by BB&T. *See* Ex. 1. For two BankAtlantic executives, the severance obligations arose under employment contracts that long predated the July 31, 2012 sale of BankAtlantic to BB&T.

4.     Upon making the severance payments, BBX is entitled to be reimbursed by BB&T under the terms of the Stock Purchase Agreement. Upon information and belief, the sole barrier is regulatory approval.

5.     The banking agencies, however, have unlawfully blocked BBX from making the required payments by erroneously classifying the payments as "golden parachute payments" and arbitrarily and capriciously denying BBX's request to pay the full amount that was bargained for during the sale transaction.

6.      As of the initial filing of this lawsuit on November 22, 2017 (more than five years after BBX sold BankAtlantic, and more than four years after BBX submitted applications for approval of certain severance payments), the FRB and FDIC had failed to approve the severance payments without providing any credible basis or explanation.

7.      The FDIC did not take any action on the long-outstanding applications until days before its response to the initial complaint was due. It issued letters on January 31, 2018 reiterating its "golden parachute" determination and agreeing to "concur" in a payment of one-year's salary to five different executives, "subject to the approval of the FRB." Composite Ex. 8. The "approved" amounts were about one-third of the amounts bargained for in the Stock Purchase Agreement. Decisions with respect to three additional executives remain outstanding.

8.      The FRB did not take any action on the long-outstanding applications until February 13, 2018. It issued a letter approving payments of the same amounts to the same five executives listed in the January 31 FDIC letters. Ex. 9. Decisions with respect to three additional executives remain outstanding.

9.      BBX does not seek a reward to BankAtlantic's executive management for bad behavior—which could be said about some of the largest institutions in this country—but instead seeks the performance of contractual obligations related to former BankAtlantic executives whose behavior was exemplary.

10.     Under Chair Alan B. Levan's and Vice Chair John E. Abdo's leadership since the mid-1980s, BankAtlantic became one of the largest community banks headquartered in Florida. From the late 1980s until 2012, the holding company BBX owned all of the shares of BankAtlantic and BBX was publicly-traded on the New York Stock Exchange.

11.     BBX seeks relief here to make full and complete severance payments, as contractually outlined, to eight former BankAtlantic executives: Chief Financial Officer Valerie C. Toalson, Chief Operating Officer Lloyd B. DeVaux, Chief Risk Officer Jay C. McClung, Chief Talent Officer Susan D. McGregor, Chief Investment Officer Lewis F. Sarrica, former Chief Executive Officer and Director Jarrett S. Levan, former Vice Chair of the Board of Directors John E. Abdo, and former Chief Executive Officer and Chair of the Board of Directors Alan B. Levan.

12.     BankAtlantic's executives, including these eight former executives, managed that Florida bank during good times and what became the worst of bad times. Under their leadership, BankAtlantic supported its communities with sensible lending practices. BankAtlantic was a conservative real estate lender—it did not make or own subprime, low documentation, no documentation, or any of the other loans that precipitated the financial crisis and resulting Great Recession.

13.     And when the Florida real estate market collapsed in the third quarter of 2007, BankAtlantic was one of the first institutions to face market conditions: most others waited months to address the market catastrophe.

14.     From the third quarter of 2007 through 2011, the financial crisis, collapse in Florida real estate prices, and Great Recession nonetheless battered BankAtlantic. In that period, Florida real estate prices suffered from unprecedented devaluation—house prices plummeted more in Florida than they had fallen nationwide during the Great Depression.

15.     BankAtlantic management led the institution through those unprecedented conditions without ever failing to meet federal capital standards and without federal assistance. BankAtlantic's deposits with a low average balance and conservative lending enabled BBX to

raise hundreds of millions of dollars in capital for BankAtlantic during the Great Recession, enabled BankAtlantic to sell bank branches at an above-market premium, and ultimately enabled the sale of BankAtlantic to BB&T Corporation at an above-market premium in the transaction that requires the severance payments here.

16.     In that unassisted transaction—meaning that the federal government did not directly support it by providing money to either company or any of their subsidiaries or indirectly support it by guaranteeing loans—BBX shareholders received a deposit premium of about 10 percent. At the closing on July 31, 2012, BBX and its subsidiaries exited the banking business and BBX became a diversified holding company that now has about $1.5 billion in assets, with subsidiaries engaged in businesses ranging from vacation ownership to chocolates, but none that involve banking.

17.     The FDIC and FRB have violated the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment by wrongfully determining, in contravention of the governing statutes, that contractually required severance payments to former BBX executives constitute "golden parachute" payments subject to regulatory approval, arbitrarily and capriciously slashing the severance payments to five former executives by about two-thirds, erroneously concluding that a second approval process is required for BBX to receive contractually-required reimbursement of approved severance amounts, and unlawfully withholding approval of three outstanding severance applications.

18.     In the five years since the closing of the sale of BankAtlantic, it has become even clearer there is no conceivable basis—let alone a reasonable, rational, or reasoned basis—for concluding that BankAtlantic management's actions justified denying approval of the full severance provided for in the Stock Purchase Agreement. On May 8, 2017, a federal jury

rejected every claim the Securities and Exchange Commission had asserted against BBX and its Chief Executive Officer Alan Levan, for securities violations—including fraud—based on BBX's disclosures about and accounting for BankAtlantic's loans in 2007. That undisputed trial record that was then summarized and made available to the banking agencies established that— far from committing securities fraud—BBX was the first to disclose the risk and effects of devaluation in the Florida real estate market. It also established that BankAtlantic's management set the standard among Florida banks for prudent underwriting, managing credit risk, and managing capital.

19.     BBX therefore sues the banking agencies for:

(a)     Issuing and applying interpretive guidance under FIRREA that restricts payment of severance to bank executives by a company that no longer takes deposits or owns a subsidiary that takes deposits, where the executives negotiated the sale of a bank to a healthy acquirer that did not cost the federal government a penny;

(b)     Issuing and applying interpretive guidance that—contrary to the purpose of FIRREA and the guidance issued by the banking agencies—penalizes banking executives for successfully navigating the worst financial crisis since the Great Depression and structuring a transaction that enabled the bank holding company to survive and transform itself, protected shareholders' equity, avoided any risk to depositors, and did not cost the federal government a penny;

    (c)      Acting arbitrarily and capriciously in denying approval for the full severance payments to five former executives over five years since the sale of the bank;

    (d)      Denying BBX due process by requiring a second unnecessary approval process in order for BBX to be contractually reimbursed by BB&T for any approved payments that BBX might make; and

    (e)      Failing to make any decision granting or denying severance—let alone provide any reason for such a decision—for three of the executives, whose applications remain pending.

20.    Accordingly, BBX seeks a judgment that: (1) as a matter of law, contractual severance payments by a company that has exited the banking business without a penny of federal assistance do not constitute "golden parachute" payments; (2) alternatively, if the payments require regulatory approval, the banking agencies have acted arbitrarily and capriciously by refusing to approve the full severance payments to five former bank executives; (3) the banking agencies have violated protectable due process rights by requiring BBX to endure a second approval process to receive contractually-required reimbursement from BB&T for any severance payments made; (4) failing to make any decision on the pending applications of three former executives; and (5) a declaratory judgment permitting BBX to make the contractually obligated severance payments.[1]

---

[1] "BBX" refers to BBX Capital Corporation, formerly known as BankAtlantic Bancorp, Inc., which was the bank holding company that owned all of the stock of BankAtlantic. The Federal Deposit Insurance Corporation is also referred to as the "FDIC," the Federal Reserve Board of Governors as the "FRB," and the FDIC and FRB collectively as "the banking agencies." Ex. __ refers to exhibits to this Amended Complaint. Emphasis is added and citations and internal quotations are omitted unless otherwise indicated.

## JURISDICTION AND VENUE

21.     This Court has federal question jurisdiction under 28 U.S.C. § 1331. This action arises under federal laws including the Administrative Procedures Act, 5 U.S.C. § 702, the Federal Deposit Insurance Act, 12 U.S.C. § 1828, the Due Process Clause of the Fifth Amendment to the United States Constitution, and the Declaratory Judgment Act, 28 U.S.C. § 2201. Moreover, the statute establishing the powers and authority of the FDIC provides that "all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States." 12 U.S.C. § 1819(b)(2)(A).

22.     Venue is proper in this District under 28 U.S.C. § 1391(e), which provides that a civil action against an agency of the United States government may be brought "in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." Plaintiff BBX has its principal place of business in Fort Lauderdale, Florida, and no real property is involved here.

23.     The banking agencies have issued final and reviewable agency determinations regarding the applicability of the golden parachute regulations and reduction of approved severance amounts for five former executives by about two-thirds. *See* Exs. 8-9.

24.     The banking agencies have imposed a substantial, continuing hardship on BBX by creating serious doubts about BBX's ability to honor and willingness to take all reasonable steps to honor compensation agreements with executives, which is necessary to attract and retain skilled and experienced management.

## PARTIES

25.     Plaintiff BBX Capital Corporation is a diversified holding company headquartered in Fort Lauderdale, Florida. The company's principal holding is Bluegreen Corporation—a sales, marketing, and management company, focused on the vacation ownership

industry.

26.     BBX is also involved in the acquisition, ownership, and management of joint ventures and investments in real estate and real estate development projects, as well as acquisitions, investments, and management of middle market operating businesses. The company's stock is traded on the New York Stock Exchange under the ticker symbol BBX. Since the closing, neither BBX nor its subsidiaries has taken deposits, has been in the banking business, or has been subject to the regulatory jurisdiction of the FRB.

27.     BBX has a real and protectable interest in pursuing the enforceability of BBX's and its subsidiaries' compensation agreements including severance provisions with executive management: BBX has suffered a concrete and particularized injury that is likely to be redressed by a favorable decision. From the late 1980s through July 2012, BBX and BankAtlantic relied on such compensation agreements to attract skilled and experienced executive management from larger financial institutions, which was critical to BankAtlantic's survival and success through two banking crises. BBX continues to rely on compensation agreements, including those providing for severance payments, to attract and retain skilled executive management in a competitive marketplace for hiring and retaining management in its current business. If BBX were to fail to honor those agreements or to fail to make all reasonable efforts to make payments pursuant to those agreements, it would harm its ability to attract and retain skilled and experienced management in a competitive marketplace for those employees. Since July 2012, BBX has also engaged in several strategic transactions that have entitled BBX management, the management of its subsidiaries, or the management of the companies being acquired to severance—if BBX were to fail to honor severance agreements or fail to make all reasonable efforts to make payments pursuant to those agreements, it would impair its ability to retain

management of the companies in the period between the announcement of the transaction and any closing, limiting its ability to engage in successful mergers, acquisitions, and other strategic transactions as well as its ability to manage the business of the companies once acquired. The injuries to BBX will be redressed by a decision for BBX.

28.     The FDIC is an agency of the United States government, with its principal office in Washington, D.C. The FDIC administers the Federal Deposit Insurance Act, 12 U.S.C. § 1828, promulgated the accompanying "Golden Parachute" regulations, C.F.R. Part 359, and interpretive guidance at issue in this litigation. Under 12 U.S.C. § 1819, the FDIC can be sued "in any court of law or equity."

29.     The FRB is an agency of the United States government, with its principal office in Washington, D.C. The FRB is the central bank of the United States and is responsible for regulating and supervising certain banking institutions. *See* 12 U.S.C. § 248. Under 12 U.S.C. § 248(p), the FRB can be sued in any action involving "the Board's regulation or supervision of any bank [or] bank holding company."

**SATISFACTION OF CONDITIONS PRECEDENT**

30.     All conditions precedent to filing this lawsuit have been satisfied. Neither the Federal Deposit Insurance Act nor the Administrative Procedures Act contains an administrative exhaustion requirement relating to the severance payments. BBX submitted applications to make severance payments to five former executive officers, BBX has supplemented those applications with information requested by the FDIC, and BBX has further supplemented those applications. *See, e.g.*, Exs. 3-7. BBX subsequently submitted additional applications to make severance payments to three other former executive officers.

**BANKING STATUTES, AGENCY REGULATIONS, AND INTERPRETIVE GUIDANCE**

31.     Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") in the late 1980s in response to the savings and loan crisis. In 1988 alone, there were 279 bank failures and $54 billion in failed-bank assets. That year, the FDIC suffered its first ever operating loss, followed by several more years of losses. A 1988 study by the Office of the Comptroller of the Currency concluded that insider abuse or fraud was a significant contributing factor in nearly half of the bank failures that occurred between 1979 and 1987.[2]

32.     Congress passed FIRREA in 1989 to combat "outright fraud and insider abuse." H.R. Rep. No. 101-54(l) at 294. The Act served the central purpose of the banking agencies— protecting bank depositors and ensuring the safety and soundness of the banking system. It also increased regulatory oversight to bring banking institutions within the ambit of the FDIC and increase their safety and soundness.

33.     Consistent with the twin purposes of protecting depositors and protecting the FDIC's depleted insurance fund, Congress separately authorized the FDIC to limit or prohibit the payment of golden parachutes by certain "troubled" institutions. *See* 12 U.S.C. § 1828(k). The golden parachute provisions were codified in 1990 as an amendment to the Federal Deposit Insurance Act. As recognized by the FDIC, the purpose of the golden parachute limitations is to "protect institution assets from wrongful disposition, to provide the [FDIC] with tools to combat

---

[2] History of the Eighties—Lessons for the Future, Volume 1: An Examination of the Banking Crises of the 1980s and Early 1990s, at 16, 34 (1997), *available at* https://www.fdic.gov/bank/historical/history/3_85.pdf (last visited Mar. 14, 2018).

fraud and abuse, and to prevent payments that are inconsistent with or effectively at the expense of the Deposit Insurance Fund."[3]

34.     Indeed, Congress sought to bolster the financial soundness of the FDIC, which had been suffering operating losses, with a particular focus on institutions on the brink of insolvency. *See* H.R. 5401, 101st Congress. The text of the golden parachute provisions reflects Congress's focus on insider abuse and fraud, which played a significant role in the banking crisis of the late 1980s. Congress codified the requirement that the FDIC, when evaluating golden parachute payments, should consider any fraudulent acts or omissions, breaches of trust or fiduciary duty, insider abuse, the reasons for an institution's troubled condition, and any legal violations that may have impacted the institution's financial condition. *See* 12 U.S.C. § 1828(k).

35.     In its golden parachute regulations, the FDIC recognized that such payments could "represent unsafe and unsound practices" that could push a financially unstable banking institution "over the edge." 56 Fed. Reg. 50,529 (Oct. 7, 1991). It further recognized that any payments made before an institution's failure would "ultimately increase the cost of the failure to the deposit insurance funds." *Id.*

36.     The FDIC's golden parachute regulations, like the underlying statute, are thus focused on protecting the FDIC insurance fund and depositors. But the regulations fail to provide any significant guidance on the factors to be considered. The regulations merely parrot the statutory factors and require the applicant to address any fraudulent acts or omissions, breaches of trust or fiduciary duty, insider abuse, the reasons for an institution's troubled condition, and any legal violations that may have impacted the institution's financial condition. *See* 12 C.F.R.

---

[3] Financial Institution Letter No. 66-2010, Guidance on Golden Parachute Applications (Oct. 14, 2010), *available at* https://www.fdic.gov/news/news/financial/2010/fil10066.html.

359.4(a). These are the very same factors listed in the statute. Accordingly, the regulations are not entitled to any deference.

37.     The FDIC's regulations are similarly unhelpful in determining whether a payment is "prohibited" once an institution is no longer deemed "troubled" or is no longer involved in the banking industry. The FDIC has taken the unsupported and unsupportable position that a payment that was once prohibited under the prescribed circumstances "is prohibited forever." Ex. 2. In support of this view, the FDIC cites its comments in the Preamble of proposed regulations. *See* 61 Fed. Reg. 5926 (Feb. 15, 1996). But the FDIC's interpretation is not entitled to any deference, given that it is not supported by the text of the statute, is untethered from the statutory purposes of protecting the FDIC insurance fund and depositors, and would lead to absurd results. Moreover, the FDIC's interpretation does not address the situation here—where a company is no longer regulated by the FDIC and has exited banking in a transaction that did not cost the federal government a penny.

38.     Under FIRREA, the banking agencies only have authority to regulate or prohibit severance payments, dubbed "golden parachute payments," by an institution that takes deposits or a "covered company," namely one that owns an institution that takes deposits.

39.     At the closing in July 2012, BBX and its subsidiaries exited the banking business, none has taken deposits since, and BBX therefore ceased being a "covered company."

40.     Even if a payment is deemed a "golden parachute payment" by a covered company, the regulations provide three independent categories of "permissible golden parachute payments." 12 C.F.R. § 359.4(a)(1)-(3). According to the FDIC, two of these exceptions are applicable here—the "regulator's concurrence" exception, 12 C.F.R. § 359.4(a)(1), and the "change-in-control" exception, 12 C.F.R. § 359.4(a)(3). *See* Ex. 8. Pursuant to the agency's own

Manual of Examination Policies, if a payment is not approvable under the "change-in-control" exception, it should be independently evaluated under the "general case-by-case exception." *See* Ex. 10, § 4.1-13 (available at https://www.fdic.gov/regulations/safety/manual/).

## FACTS

A.   **BBX's Contractual Obligations to Pay Severance and the Federal Agencies' Wrongful Actions**

      1.   **The Stock Purchase Agreement and the Banking Agencies' Approval of the Sale of BankAtlantic.**

41.   The Stock Purchase Agreement between BB&T Corporation and BankAtlantic Bancorp, Inc. dated November 1, 2011, as amended, provided in Section 5.7:

> At the Closing, Seller shall assume and be responsible for the payment of the obligations of the Bank or any Affiliate to pay to the individuals listed on Schedule 5.7(h) hereto the amounts set forth opposite their names on such schedule. Seller shall make all applicable Tax withholdings and file all forms reporting such payments to the appropriate Governmental Authority. Such payments made by Seller shall comply with Section 409A of the Code. Purchase shall reimburse Seller for all amounts paid pursuant Schedule 5.7(h), without duplication for any amount credited to Seller on the Closing Balance Sheet pursuant to the Bank Accounting Principles or otherwise.

Ex. 1. The referenced Schedule 5.7 then detailed the customary severance payment sums that BBX had agreed to in arms-length negotiations with BB&T.

42.   On April 18, 2012, counsel for BBX provided information to the FDIC concerning the sale of BankAtlantic, including copies of the Stock Purchase Agreement, as Amended, the confidential Schedule 5.7 to that Agreement detailing severance payment amounts, a November 1999 employment agreement with Mr. McClung, and an April 2001 employment agreement with Mr. DeVaux.

43.   On July 16, 2012—at the insistence of the banking agencies—BB&T agreed that neither BB&T nor its affiliates would reimburse BBX or its affiliates for any severance payments to the former BankAtlantic executives, absent written opinions from the banking agencies that

such payments were not "golden parachute" payments or approving the payments pursuant to 12

CFR Part 359.

44.     On July 16, 2012 the FDIC issued an order approving BB&T's application for

consent to acquire BankAtlantic, which included the following:

> Pursuant to Section 18(c) and other provisions of the Federal Deposit Insurance
> (FDI) Act, Branch Banking and Trust Company, Winston-Salem, Forsyth County,
> North Carolina, an insured state nonmember bank with total resources of
> $169,026,116,000 and total deposits of $128,387,769,000 as of March 31, 2012,
> has filed an application for the Corporation's consent to merge under its charter
> and title with BankAtlantic, Fort Lauderdale, Broward County, Florida, an insured
> federal savings bank with total resources of $3,821,152,000 and total deposits of
> $3,462,102,000 as of March 31, 2012, and to establish the seventy-eight branches
> of BankAtlantic as branches of the resultant bank.. . . .

> In connection with the application, the Corporation has taken into consideration
> the financial and managerial resources and future prospects of the proponent
> institutions and the resultant bank, the convenience and needs of the community
> to be served, and the risk to the stability of the United States banking system. The
> Corporation has also taken into consideration the effectiveness of the insured
> depository institutions involved in the proposed merger transaction in combating
> money laundering activities. Having found favorably on these statutory factors
> and having considered other relevant information, including any report on the
> competitive factors furnished by the Attorney General of the United States, it is
> the Corporation's judgment that the application should be and hereby is approved.

45.     On July 31, 2012, the FRB announced its approval of the sale of BankAtlantic to

BB&T, which included the following:

> The Board has considered the financial and managerial resources of BB&T, its
> subsidiaries, and BankAtlantic and the effect of the transaction on those
> resources, in light of confidential reports of examination, other supervisory
> information from the primary federal supervisor of the organizations involved in
> the proposal, publicly reported and other financial information, information
> provided by BB&T and BankAtlantic, and other relevant information. The Board
> also consulted with the FDIC, the primary federal supervisor of BB&T's lead
> subsidiary depository institution, Branch Bank, and the Office of the Comptroller
> of the Currency ("OCC"), the primary federal supervisor of BankAtlantic and
> FSB.

> The Board has considered the financial factors of the proposal. BB&T's
> regulatory capital ratios are well above the minimums required of well-capitalized
> bank holding companies and would remain so on consummation of the proposal.

BB&T's subsidiary depository institutions are well capitalized and would remain so after consummation. BB&T would acquire approximately $2.1 billion in loans and assume approximately $3.3 billion in deposits from BankAtlantic, as well as approximately $285 million in outstanding TPS. The transaction would be funded with available cash on hand, and there are no plans to raise additional capital or issue any debt obligations in connection with the transaction. Asset quality and earnings prospects also are consistent with approval.

46.     On July 31, 2012, the sale of BankAtlantic to BB&T closed.

### 2.     The Banking Agencies' Misclassification of the Severance Payments.

47.     On April 4, 2013, about a year after being advised of the severance payments and eight months after BBX's exit from the banking business at closing, the FDIC nonetheless asserted that any payment by BBX to BankAtlantic's former executives were "golden parachute payments" that required regulatory approval. The FDIC claimed that because BBX's former bank subsidiary had previously been designated as in a troubled condition, the severance payments would be "prohibited forever" absent regulatory approval. Ex. 2.

48.     The FDIC's April 4, 2013 letter quoted as follows from the preamble to its final rule contained in 12 C.F.R. Part 359:

> The FDIC specified in the preamble to the Second Proposal that a golden parachute payment which is prohibited from being paid at the time of an IAP's termination due to the troubled condition of the insured depository institution or holding company cannot be paid to that IAP at some later point in time once the institution or holding company is no longer troubled. *See* Second Proposal § 359.1 (f)(1)(iii). Several commenters requested that the FDIC reconsider its position on this point. The FDIC believes the position taken in the Second Proposal is consistent with the language and spirit of the statute. The language of section 18(k)(4)(A)(ii) of the FDI Act provides that any payment which is contingent on the termination of an IAP's employment and is received on or after an institution or holding company becomes troubled is a prohibited golden parachute. *If this payment is prohibited under the prescribed circumstances, it is prohibited forever.*

49.     The FDIC's April 4, 2013 further quoted from that Preamble as follows:

> *The purpose of this rule is to prevent the improper disposition of institution assets and to protect the financial soundness of insured depository institutions, depository institution holding companies, and the federal deposit insurance funds.*

The regulation, similar to the statute, limits both golden parachute payments and agreements to make golden parachute payments. As a consequence, the FDIC has taken the position that it may review a golden parachute payment at the time that it is being made, notwithstanding a prior approval of the particular golden parachute agreement. This has been called the "double approval" process.... In addition, the golden parachute regulation requires the FDIC to determine "the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment." 12 C.F.R. § 359.4(b)(2) .... While wanting to protect IAPs involved in hostile takeovers, the FDIC was also concerned that an IAP who had been substantially responsible for the institution's troubled condition should not profit in the circumstances. 60 Fed. Reg. at 16072-73.

50.    The FDIC then quoted from its 2010 letter providing guidance on Golden Parachute applications as follows:

As noted in the FDIC's original regulatory proposal, *the purpose of the statute and regulations is to* preclude institutions that are experiencing financial difficulty from making payments to institution-affiliated parties ("IAPs") that are not in the best interests of the institution, to protect institution assets from wrongful disposition, to provide the Corporation with tools to combat fraud and abuse, and to *prevent payments that are inconsistent with or effectively at the expense of the Deposit Insurance Fund*. See e.g., 56 Fed. Reg. 50,529, 50,530 (Oct. 7, 1991).

51.    The FDIC did not explain how after the closing, which immediately divested BBX of its only banking subsidiary and required BBX to exit banking, BBX remained a "covered institution" under the statute or the regulations.

52.    The FDIC did not address the acquisition of a bank by a healthy acquirer, let alone of a Florida bank in the midst of a financial crisis that was the "worst in human history" and had caused an unprecedented collapse in Florida real estate prices, in a transaction that did not cost the federal government a penny.

53.    In recent correspondence, the FDIC has reiterated its classification of the severance payments as "golden parachute payments" subject to regulatory approval without addressing the acquisition or BBX's status as a non-banking entity. Ex. 8.

3.      **BBX's Severance Applications to make payments to five former BankAtlantic Executives.**

54.     On September 16, 2013, BBX submitted applications to make severance payments to five former BankAtlantic executive officers—Chief Financial Officer Valerie C. Toalson, Chief Operating Officer Lloyd B. DeVaux, Chief Risk Officer Jay C. McClung, Chief Talent Officer Susan D. McGregor, and Chief Investment Officer Lewis F. Sarrica. The applications, among other things, set forth their periods of employment, compensation histories, and services performed.

55.     On February 4, 2014, the FDIC requested supplemental information for each of those five executive officers, including the calculation of each severance payment, each officer's prior three-years total compensation, any compensation received from BB&T, amended certifications, and any BBX or BankAtlantic committees on which each officer participated and the dates of service as well as additional certifications.

56.     On March 7, 2014, BBX submitted the requested supplemental information regarding each of the five executive officers.

57.     BBX's September 16, 2013 applications and March 7, 2014 supplements established that BBX sought reasonable severance payments.

58.     The five applications languished for years without any action by the banking agencies.

59.     On July 13, 2017, BBX supplemented the applications regarding the five executive officers with publicly-available information from examination reports, BBX's SEC filings, and the trial record from the case in which every claim asserted by the SEC against BBX and Alan Levan was rejected. The letter reiterated BBX's position that the severance payments

did not require regulatory approval under FIRREA. And it explained how every statutory factor

supported approving the severance:

- *No Reasonable Basis for Finding Fraud or Insider Abuse*: A federal jury has rejected every one of the SEC's allegations of fraud. No other suggestion of any fraud or insider abuse exists because there was none. Indeed, the undisputed trial record in the SEC litigation showed that BankAtlantic's management recognized the risks of devaluation before federal officials and their peers. They then acted swiftly to disclose those risks and take loan loss provisions so that they could begin managing the effects of that devaluation, working out loans, and exploring strategic alternatives for reducing BankAtlantic's balance sheet and its need for capital.

- *No Reasonable Basis for Believing Management Was Responsible for Troubled Condition:* BankAtlantic neither made nor owned any of the risky residential loans that caused the financial crisis. Its troubled condition was driven solely by an "unprecedented" collapse of Florida real estate prices. And its management then used the superior position created by BankAtlantic's prudent lending, head start on loan work outs, and low-cost deposits to find a creative structure for an unassisted transaction that eliminated any risk to BankAtlantic's depositors and did not require a penny from the insurance fund.

- *No Reasonable Basis for Believing Management Materially Violated any Banking Law:* In the ten years since BankAtlantic began taking substantial loan loss provisions, no one has ever alleged a material violation of banking law that had a material effect on BankAtlantic's financial condition. There was none.

- *No Reasonable Basis for Believing Management Violated any Criminal Law:* In the ten years since BankAtlantic began taking substantial loan loss provisions, no one has ever alleged that any member of management committed a crime, let alone one of those listed in FIRREA. None did.

- *Institution-Affiliated Parties' Responsibilities, Services Rendered, and the Reasonableness of Their Compensation:* The prior applications dated September 6, 2013 and May 7, 2014 set forth the Institution-Affiliated Parties' responsibilities, services rendered, and the reasonableness of their compensation, which support approving the severance payments.

60.    In the July 13, 2017 supplemental letter, BBX wrote: "Absent approval of these

severance payments by the end of this month—five years after the closing of the sale of

BankAtlantic to BB&T—BBX will be compelled to sue in court seeking a declaration it is

entitled to make them."

61.     On July 25, 2017, counsel for the FRB emailed: "While we are actively reviewing these applications, there is no estimate for when a decision will be reached, though it is unlikely that it will be by the end of July." He also posed a follow-up question about reconciling a difference between the amount in BankAtlantic's former Chief Operating Officer Lloyd DeVaux's severance as calculated by his employment agreement and the amount listed in the Stock Purchase Agreement: the difference totaled $7,284. Counsel for BBX promptly responded to explain the mechanics but also wrote: "[T]he difference is immaterial, BBX does not want to create any risk of further delay, and BBX would therefore appreciate the approval of either sum by August 11."

### 4.     BBX's Severance Applications to make payments to three additional former BankAtlantic Executives

62.     BBX had not previously submitted applications on behalf of BankAtlantic's three highest-ranking directors and officers—Alan Levan, John E. Abdo, and Jarett Levan—because it sought first to secure approval to pay severance to every other eligible BankAtlantic director, officer, and employee.

63.     It had become clear, however, that the banking agencies intended to continue delaying action on the five applications that had already been outstanding for several years. Accordingly, BBX submitted severance applications for Alan Levan, John E. Abdo, and Jarett Levan on July 26, 2017.

64.     The record in support of the applications of the five former executives was substantially similar to that of the newly submitted applications. BBX submitted detailed supporting information, including some of the details the FDIC had previously requested in reference to the prior applications. Additionally, BBX again summarized the trial record of the federal securities case that had recently been resolved in favor of Alan Levan and BBX. It

explained why that federal jury verdict, which rejected every securities law claim, supported the conclusion that BankAtlantic's highest executives were among the best at navigating the unprecedented Florida real estate market crash.

### 5. BBX Is Forced to Sue the Banking Agencies.

65.     BBX had hoped that its recent submissions would encourage the banking agencies to make timely decisions regarding the pending applications. But what BBX received in response was more delay. In an August 11, 2017 phone call, the FRB suggested that it might be several more weeks, but not months, before a decision could be made.

66.     From August 18, 2017 to August 31, 2017, counsel for the FRB posed a series of questions about the mechanics of the Stock Purchase Agreement, stay bonuses, and severance payments—all of which could have been raised immediately after the closing of the transaction over five years earlier. By September 5, 2017, counsel for BBX had responded to all of those questions.

67.     More than three months after the FRB had suggested that a decision might be made within weeks, BBX still had not received any decision on the five applications that had been pending for more than four years. The FRB stated the necessary paperwork had not yet gone to the Board of Governors. BBX sued here on November 22, 2017.

68.     BBX did not hear from the banking agencies again until days before their responses to the complaint were due.

69.     On January 31, 2018, the FDIC sent letters to BBX's counsel regarding the five executives' applications that had been on file since September 2013. The FDIC noted that the applications were "complete" and its correspondence "represent[ed] the FDIC's final agency decision on the application[s]." The FDIC reiterated its conclusion that the severance payments were subject to regulatory approval as "golden parachute payments." It agreed it "would concur"

in a payment representing each executive's annual salary, but "would not concur in payment . . . in any amount above one year's salary." And it noted that BB&T would be required to file a separate application before reimbursing BBX for any severance payment made.

70.     The "approved" amounts represented substantial reductions from the amounts bargained for and provided in the Stock Purchase Agreement. A comparison of the bargained for amounts and the "approved" amounts is listed in the chart below. *See* Exs. 1, 8, 9.

| Former BankAtlantic Executive | Severance Amounts[4] | Reduction | Percentage Reduction |
|---|---|---|---|
| **Lloyd DeVaux** *Former Chief Operating Officer* | **Bargained for in Stock Purchase Agreement: $1,319,114** <br><br> "Approved" by the Federal Banking Agencies: $440,016 | **$879,098** | **67%** |
| **Lewis Sarrica** *Former Chief Investment Officer* | **Bargained for in Stock Purchase Agreement: $920,451** <br><br> "Approved" by the Federal Banking Agencies: $318,352 | **$602,099** | **65%** |
| **Susan McGregor** *Former Chief Talent Officer* | **Bargained for in Stock Purchase Agreement: $893,713** <br><br> "Approved" by the Federal Banking Agencies: $296,560 | **$597,153** | **67%** |
| **Jay McClung** *Former Chief Risk Officer* | **Bargained for in Stock Purchase Agreement: $743,258** <br><br> "Approved" by the Federal Banking Agencies: $373,217 | **$370,041** | **50%** |
| **Valerie Toalson** *Former Chief Financial Officer* | **Bargained for in Stock Purchase Agreement: $995,438** <br><br> "Approved" by the Federal Banking Agencies: $338,039 | **$657,339** | **66%** |

---

[4] For Jay McClung and Lloyd DeVaux, the contractual severance amounts were also provided for in employment agreements that long pre-dated the Stock Purchase Agreement and sale of BankAtlantic to BB&T.

71.     According to the FDIC, the "approved" amounts represented each executive's salary in 2011—the "last full year of employment." The FDIC did not explain how or why it selected 2011, despite previously requesting salary information for the three years prior to the sale of BankAtlantic. As BBX previously advised the FDIC, the executives had voluntarily taken substantial salary reductions in 2011.

72.     The FDIC also did not explain why it imposed an arbitrary cap of twelve months' salary under § 359.4(a)(1), even though that limitation does not appear in the regulatory text of that subsection. Indeed, the agency's own Manual of Examination Policies provides: "Any requests for payments in excess of this amount (12 months' salary) would have to be considered for approval under the general case-by-case exception." Ex. 8.

73.     The FDIC also did not make any findings regarding at least two of the regulatory factors outlined in § 359.4(a)(4), including: (i) the lack of any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse, and (iii) the lack of any material violation of any applicable federal or state banking law or regulation.

74.     On the heels of the FDIC's letters, the FRB subsequently issued a letter on February 13, 2018 stating that it would approve the amounts that had been approved by the FDIC. It also expressly noted that "BB&T must request approval under 12 C.F.R. part 359 prior to making reimbursements for the golden parachute payments." Ex. 9.

75.     The banking agencies have taken no action on the applications for Alan Levan, John Abdo, and Jarett Levan, which have been pending since July 26, 2017 and are based on the same record as the five executives' applications that were recently "approved."

B.     **The Record Before the Agency Compels the Conclusion that BBX is Entitled to Make the Full Severance Payments.**

     1.     **BBX and BankAtlantic's Management Set the Standard for Disclosure, Credit Management, and Capital Management in Unprecedented Market Conditions.**

76.     The issue before the FDIC and the FRB was not a close call. None of the relevant statutory factors governing permissible "golden parachute" payments would preclude the severance payments BBX has proposed. There is no indicia of fraud or insider abuse. BBX management did not have a hand in pushing the bank into a troubled condition, which was caused solely by the decline in the real estate market.

77.     In the years leading up to the sale of BankAtlantic to BB&T, the performance of BankAtlantic's executive officers was exemplary.

78.     Under the stewardship of BankAtlantic's management team, BankAtlantic built a strong retail deposit base and supported its communities with conservative lending.

79.     In the early 2000s, market forces were set in motion that would eventually lead the banking system to the brink of a systemic collapse. The magnitude of the problem became undeniable in fall of 2008, and the country avoided another Great Depression through massive government intervention.

80.     BankAtlantic survived, and its management led the institution through the worst financial crisis since the Great Depression without ever failing to meet federal capital standards and without a penny of financial support from any governmental agency.

81.     Indeed, when the Florida real estate market collapsed as a result of the banking crisis, BankAtlantic was one of the first institutions to face market conditions while most others waited months to address the catastrophe.

### a.      BankAtlantic's Pre-Crash Lending Practices

82.     In the mid-1980s and 1990s, long before the historic market crash, BankAtlantic became one of the largest community banks headquartered in Florida. It was well-respected for its low-cost deposit franchise and conservative lending.

83.     BankAtlantic's management consistently received favorable reviews from the Bank's regulator—the Office of Thrift Supervision (OTS). On June 23, 2006, for example, the Report of Examination from the OTS noted, "BankAtlantic is financially sound and prudently operated by an experienced executive management team." It described the allowance for loan and lease losses as "adequate" and BankAtlantic's loans as "prudently underwritten and properly classified."[5]

84.     The OTS also recognized that BankAtlantic had been expressing concern about the real estate market long before prices took a nose dive in the third quarter of 2007. In its November 9, 2007 examination report, the OTS noted "[f]or several years now, the board and senior management have been concerned that a slowdown in the real estate market was likely" and had curtailed loan production, which "resulted in reduced exposure to land and construction loans." It concluded, "[a]side from [acquisition, development, and construction] loans, the overall quality of the remaining loan portfolio was satisfactory," and that broader commercial real estate "underwriting standards and risk management practices are satisfactory."

### b.      The Market Collapse

85.     In the third quarter of 2007, the Florida real estate market collapsed. Every Florida banking institution, including BankAtlantic, was exposed. The degree of exposure was

---

[5] OTS examination reports are generally confidential. The OTS, however, authorized public release of the reports in connection with civil litigation brought against BBX and certain of its directors and officers, which ended with a judgment for BBX and its directors and officers on every claim asserted.

driven by underwriting standards, the extent to which they had been followed during loan origination, and the extent to which the institution timely recognized asset quality problems.

86.     BankAtlantic had applied good underwriting standards and was prompt in responding to adverse market conditions, but it could not have anticipated the magnitude or severity of the coming crisis created by the irresponsible lending of others.

87.     The challenge presented by the financial crisis and Great Recession's impact on Florida real estate prices was enormous, as shown by the following chart of Freddie Mac housing price data:



88.     Professor Christopher James, a financial economist at the University of Florida who has consulted for both the FRB and the FDIC, noted that the collapse in Florida real estate prices was "unprecedented":

> [I]f you are looking at the third quarter of 2007 onward, you get really what is unprecedented in Florida history, declines that last until I think the first time we experienced an increase, again, was the last quarter of 2011.
>
> So, you go through this sustained period of price declines that are—many markets in Florida still haven't recovered to the levels of prices that we saw in 2005, 2006.

To give you some idea of just how unprecedented this is, house prices fell through the financial crisis that began in the third quarter of '07 more than they fell nationwide during the Great Depression. It's just an unprecedented collapse of the real estate market.

89.     Former FRB Chair Ben Bernanke has since written:

In public I described what was happening as the "worst financial crisis since the Great Depression," but privately I thought that—given the number of major financial institutions that had failed or come close to failure, its broad-based effect on financial and credit markets, and its global scope—it was almost certainly the worst in human history.[6]

90.     Many financial institutions were unprepared or unwilling to acknowledge the reality in 2007 that dark days were ahead. BBX and BankAtlantic, however, were not among them. BankAtlantic was aggressive in writing down loans. It felt an obligation to report losses and move certain loans to non-accrual even though some were less than 10 days delinquent.

### c.     BankAtlantic's Response to the Crash

91.     Long before their peers, BBX and BankAtlantic's management disclosed the risks and effects of devaluation in the Florida real estate market. From January to August 9, 2007, other financial institutions, economists, professional forecasters, and government officials (including FRB Chair Ben Bernanke and Treasury Secretary Henry Paulson) predicted that problems in the subprime market had been contained, would not affect the broader financial system, would not affect the broader economy, and would not impede a housing recovery in 2008.

92.     Key federal officials made the following public statements:

---

[6] Ben S. Bernanke, *The Courage to Act: A Memoir of a Crisis and its Aftermath* Location 2008 (W.W. Norton & Co. Kindle ed. 2015).

- *FRB Chair Ben Bernanke—March 28, 2007*: "At this juncture, however, the impact on the broader economy and financial problems in the subprime markets seems likely to be contained."

- *Chair Bernanke—May 17, 2007*: "[W]e believe the effect of the trouble in the subprime sector of the broader housing market will likely be contained and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system. The vast majority of mortgages, including even subprime mortgages, continue to perform well."

- *FRB Monetary Report to Congress—July 18, 2007*: "Financial market conditions have continued to be generally supportive of economic expansion," monetary policy remained unchanged, and "data appeared to confirm that economic growth had strengthened in the second quarter of 2007 despite the ongoing adjustment in the housing sector."

- *Secretary of Treasury Henry Paulson—July 23, 2007*: "I don't see [subprime mortgage market troubles] imposing a serious problem. I think it's largely going to be contained."

93.     On the other hand, consistent with BBX's public disclosures and contrary to the consensus of other financial institutions and other government officials, BankAtlantic's management prepared to weather a more significant downturn.

94.     On March 14, 2007, for example, Alan Levan emailed BankAtlantic's Major Loan Committee warning that, in part because of the "subprime market bust," "we are in for a long sustained problem" in the housing sector. He wrote that BankAtlantic needed to refuse extensions for weaker acquisition and development loans and to insist on additional security

when granting any extensions. He explained: "[l]ater, with pressure from all the banks, the borrower[s] will not be able to accommodate us." And, indeed, in the first half of 2007, BankAtlantic refused to extend the weaker loans and instead extended loans with substantial loan-to-value cushions, conditioned extensions on new appraisals, conditioned extensions on additional guarantors, and conditioned extensions on additional collateral.

95.    On August 9, 2007, the French bank BNP Paribas refused redemptions for hundreds of millions of dollars invested in securities backed by subprime mortgages and, overnight, interbank borrowing costs quintupled.

96.    Former FRB Chair Bernanke has since written by "mid-August [2007], I knew I had been quite wrong, of course."[7]

97.    Under the direction of BBX and BankAtlantic's management, BankAtlantic immediately re-assessed the value of the collateral for its commercial real estate loans and, on October 25, 2007, BBX reported a loss of $29.6 million driven by BankAtlantic's over $48 million in loan loss provisions and impairments for real estate owned. BBX and BankAtlantic's executive officers sought to set the standard for forthright disclosure and avoid dribbling out bad news, which had caused other financial institutions to lose the trust of stockholders and depositors during the savings and loan crisis, hobbled their ability to respond, and contributed to their failures.

98.    By being the first among its peers to disclose real estate loan risks in 2007 and the first to report losses driven by the financial crisis on October 25, 2007, BBX stood out as an outlier and its stock plummeted. Predictably, a private civil securities lawsuit was filed four days

---

[7] Ben S. Bernanke, *The Courage to Act: A Memoir of a Crisis and its Aftermath* Location 2008 (W.W. Norton & Co. Kindle ed. 2015).

later on October 29. It was followed by an informal SEC inquiry within three months, then a formal SEC investigation, and finally an SEC enforcement action filed in January 2012.

99.     BBX and Alan Levan would spend almost 10 years and over $20 million defending themselves against the private securities litigation and the tag-along SEC enforcement action, but ultimately won two separate final judgments rejecting every claim asserted because it became clear that BankAtlantic was a pillar of conservative management among its peers.

### 2.     BankAtlantic's Management Successfully Navigated the Financial Crisis and the Great Recession.

100.    From 2008 until 2012, BankAtlantic continued its strategy of—as Alan Levan put it in the March 14 email to the Major Loan Committee—refusing to merely "wait for the market to further deteriorate" and "hop[e] more time will solve [the] problems." Instead, BankAtlantic managed its capital ratios by reducing the size of its balance sheet by over 30 percent, aggressively improving operating efficiencies, raising hundreds of millions in new equity, and effectively managing its loan portfolios and credit issues.

101.    Throughout, BBX and BankAtlantic's management thought ahead and executed numerous strategic initiatives to protect BBX stockholders, BankAtlantic depositors, and the FDIC. BankAtlantic secured a buyer for its branches in Tampa, Florida. And BankAtlantic successfully secured capital contributions from its parent companies BBX and BFC Financial Corporation.

102.    Market concerns—driven by continuing declines in real estate values—nonetheless caused OTS to designate BankAtlantic as a "troubled institution."  But in its 2010 Report of Examination, OTS continued to recognize BankAtlantic's favorable capital support, adequate liquidity levels, effective compliance process, and responsive management.

103.    At the end of 2011, BankAtlantic maintained high capital ratios and presented no risk to its depositors or the FDIC. In fact, throughout the economic decline, BankAtlantic exceeded minimum required regulatory capital ratios. As of December 31, 2011, BankAtlantic's capital ratios were:

- Tier 1/Core Capital of 8.22%;
- Tier 1 Risk-Based Capital of 12.93%; and
- Total Risk-Based Capital of 15.15%.

104.    At the same time, BankAtlantic successfully retained its deposit customer relationships and importantly, further lowered its cost of deposits. BankAtlantic's cost of deposits was 2.13% in 2007 and 0.40% in 2011, the last fiscal year before BankAtlantic's sale to BB&T.

105.    And in that same year BankAtlantic's liquidity as a percentage of deposits was 36.7%. Indeed, notwithstanding the economic pressures on it, BankAtlantic won the J.D. Power award for Customer Satisfaction in 2010 for the highest ranking for customer satisfaction among retail banks in Florida.

### 3.    BankAtlantic's Management Successfully Negotiated, Structured, and Closed a Transaction that Removed BBX from the Banking Business without Costing the Government a Penny.

106.    BankAtlantic management knew that it had made an early start on switching to workout mode and had been aggressive in recognizing losses since the third quarter of 2007. At the first signs of the financial crisis in the third quarter of 2007, management had directed the accounting and credit departments to write down non-performing loans and real estate owned to the lowest allowable values in each period. In the summer of 2011, management also believed that Florida real estate values would soon begin to rebound (and as shown in the above chart, ¶ 74, BankAtlantic management's assessment was later proven to be correct).

107.    With this knowledge, BBX felt comfortable entering into the sale of BankAtlantic to BB&T in which BBX would receive non-performing assets—mostly non-performing loans and real estate taken for loans that had gone bad—from BankAtlantic as part of the transaction. BBX felt confident in the quality of BankAtlantic's loan portfolio and other real estate owned. It knew these written down non-performing assets were well underwritten loans, negatively impacted by the economy. When the market recovered, so would the value of these assets.

108.    BB&T would purchase the stock of BankAtlantic and, as a result, all of its assets and liabilities, including the valuable branch network and low-cost deposits, other than the over $600 million of BankAtlantic's non-performing assets that would be transferred to BBX.

109.    Additionally, as part of the transaction, BB&T acquired all the debt held in the form of Trust Preferred Securities by BBX and repaid them fully upon closing. As a result, BB&T acquired a pristine bank from BBX, BBX retained all of the problem assets, BBX's debtholders were paid in full, BBX shareholders maintained upside opportunity, and depositors, taxpayers, and the FDIC insurance fund were in no way impacted or involved.

110.    Pursuant to that amended Stock Purchase Agreement, before closing, BankAtlantic created a subsidiary and contributed to it about $50 million in cash as well as performing and non-performing loans, tax certificates, and real estate owned with an aggregate carrying value of about $346 million as of July 31, 2012.

111.    At the closing of the BB&T Transaction, BB&T received 95% of the outstanding preferred membership interests in the subsidiary while BBX continued to hold 5%. Under the terms of the subsidiary's formation document, BB&T held its 95% preferred interest in the net cash flows until it had recovered $285 million in preference amount plus a priority return of LIBOR + 200 basis points annually on any unpaid preference amount. The agreements gave the

subsidiary seven years to monetize its non-cash assets and pay BB&T's preference amount without penalty.

112.    In fact, by May 6, 2015, the newly created subsidiary had monetized assets and realized gains sufficient to pay off BB&T in full—some four years ahead of schedule.

113.    In short, BBX's management structured the BB&T transaction so that BBX would retain BankAtlantic assets it knew had long-term value even though potential acquisition partners were unwilling initially to touch them. It then re-structured the deal so that a mix of performing assets and those non-performing assets could be monetized over time to pay off BB&T for assuming the TruPS obligations. And BBX's obligations to BB&T were then paid off some four years ahead of schedule. None of the strategic alternatives executed by BankAtlantic cost the government a penny.

114.    At the closing of the sale of BankAtlantic, BBX became a diversified holding company that now has about $1.4 billion in assets, with subsidiaries engaged in businesses ranging from vacation ownership to chocolates, but none that involve banking or taking deposits.

**4.    Recent Developments Confirm that BankAtlantic's Management Outperformed Their Peers.**

115.    In the over five years since the closing of the sale of BankAtlantic, it has become even clearer there is no conceivable basis—let alone a rational, reasonable, or reasoned basis—for concluding that management's actions justified denying approval of severance.

116.    As explained, BBX and BankAtlantic's timely disclosure and conservative loss recognition in the third quarter of 2007 precipitated private securities litigation and, then, an SEC enforcement action. *See* ¶¶ 89-97, above.

117.    On July 23, 2012, the United States Court of Appeals for the Eleventh Circuit reversed what little the private securities plaintiffs had won in a 2010 trial and remanded for the

district court to enter the resulting final judgment for BBX and the individual defendants rejecting every claim asserted. *Hubbard v. BankAtlantic Bancorp Inc.*, 688 F.3d 713 (11th Cir. 2012).

118.    On May 8, 2017, a federal jury rejected every claim the SEC had asserted against BBX and Alan Levan, for securities violations—including fraud—based on BBX's disclosures during the financial crisis in 2007. The SEC did not appeal the resulting judgment.

119.    The undisputed trial record established that—far from committing securities fraud—BBX was the first to disclose the risk and effects of devaluation in the Florida real estate market. It also established that BankAtlantic's management set the standard among Florida banks for prudent underwriting, managing credit risk, and managing capital. BBX refused to settle either the private securities litigation or the SEC enforcement action as a matter of principle and also because any settlement would have squandered capital that BBX needed to ensure that BankAtlantic remained well-capitalized.

120.    The evidence at trial showed that the warnings about the risks of the Florida real estate market made by BankAtlantic's Florida peers—Bank of Florida, BankUnited, Seacoast Bank, and TIB Bank—lagged far behind BBX. Three of those four institutions failed, including the failure of BankUnited, at a cost to the FDIC of about $8 billion.

121.    On the other hand, BBX's publicly-traded Class A Common Stock increased 110% to $5.00 following the agreement with BB&T. The holders of BBX's $285 million in TruPs saw their securities fully redeemed in connection with the sale. On July 31, 2012, the date the transaction was consummated, BBX Capital's Class A Common Stock closed at $6.04; and on July 12, 2017, it closed at $6.42. This successful sale transaction stands in stark contrast to the

many other institutions that required TARP assistance or FDIC loss-share assistance to find a buyer and whose equity and debt holders were wiped out.

## C.   The FDIC Has Unreasonably, Arbitrarily, and Capriciously Reduced Contractual Severance Payments Owed to Five Former BankAtlantic Executives[8]

122.   FIRREA outlines relevant factors governing the banking agencies review of severance payments that qualify as "golden parachute payments," including: (1) whether there is any indicia of fraud or insider abuse; (2) whether there is a reasonable basis to believe that the executive was responsible for the troubled condition of a covered entity; (3) whether the executive violated any laws that had a material effect on the covered entity; and (4) the executive's period of employment, compensation history, and services performed.

123.   Despite the exemplary performance of BankAtlantic's management, the banking agencies have unreasonably, arbitrarily, and capriciously failed to approve the full severance payments owed to these executives, some of whom are retired and in their seventies.

124.   BBX's submissions to the FDIC and FRB demonstrated a clear and unrebutted rationale for approval of each individual executive's severance:

### 1.   Lloyd DeVaux—Chief Operating Officer

125.   BBX sought to pay Mr. DeVaux about $1.3 million in severance, or about two times his base salary and bonus for the years prior to the Stock Purchase agreement, consistent with his 2001 employment agreement with BankAtlantic. Mr. DeVaux's employment agreement specifically provided that in the event of a change in control of BankAtlantic, Mr. DeVaux

---

[8] BBX maintains its position that regulatory approval is not required under 12 U.S.C. § 1828 because BBX did not make any severance payment or agree to make any severance payment as an "insured depository institution or covered company." But even if approval is required, substantially reducing the payments was arbitrary and capricious.

would be paid an amount equal to two times his annual salary and the higher of his preceding two years' cash bonuses.

126.    Mr. DeVaux worked at BankAtlantic as its Chief Information Officer from 2001 to 2004 and as its Chief Operating Officer from 2004 until the sale of BankAtlantic on July 31, 2012. After closing, Mr. DeVaux worked for BB&T to assist with integration through October 25, 2012.

127.    At BankAtlantic, Mr. DeVaux was responsible for the Bank's operational policies and initiatives, including branch operations and the Bank's information systems, and he was a member of the executive management team. As part of executive management, Mr. DeVaux was extensively involved in:

- Budgeting and reviews of each department to eliminate all unnecessary expenses to streamline processes and departments.

- Consolidating departments to reduce headcount, floor space, and other expenses.

- Supporting and maintaining all production and management information systems to ensure they were working properly, reports were available daily, reports were developed as requested, overseeing maintaining, troubleshooting, and upgrading database systems, investigating new database technology, and implementing security changes approved by BankAtlantic's information security department.

- Overseeing 1 day deposit processing, including check processing.

- Monitoring Small Business Unit performance and eliminating unprofitable lines of business.

- Eliminating unnecessary office space through subletting, non-renewal of leases, and reducing the inventory of future branch locations from over 25 to less than five locations by selling sites, assigning leases, or subletting space.

- Reviewing the performance of each branch, eliminating underperforming branches where feasible by closing or selling locations.

- Reviewing all contracts, reducing costs where possible by renegotiating contracts, changing suppliers, and eliminating unnecessary services and centralized purchasing of high volume supplies for better cost controls.

- Working closely with third parties doing due diligence in connection with branch sales and the sale of the Bank.

- Assisting BB&T through the conversion as part of the transition team to ensure a smooth migration with minimal customer disruption.

128.    Mr. DeVaux served on a number of BankAtlantic committees, including the New Branch Committee, Talent Management Committee, Executive Management Council, Senior Management Group, ALCO Committee, New Store Committee, SOX Committee, Executive Compliance Committee, Technology Steering Committee, New Product Committee, Investment Committee, Non-Deposit Investment Committee, Incentive Plan Design Committee, Compliance Oversight Committee, and Credit Policy Committee. He also served on the Parent Company Investment Committee of Bancorp.

129.    Mr. DeVaux was never accused of any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse. He did not contribute to BankAtlantic's designation as a "troubled institution." He was never accused of any violation of federal or state laws that would impact the Bank's financial condition.

### 2.    Jay McClung—Chief Risk Officer

130.    BBX sought to pay Mr. McClung about $743,258 in severance, or about two times his base salary at the time of his resignation, consistent with his 1999 employment agreement with BankAtlantic. Mr. McClung's employment agreement specifically provided that in the event of a change in control of BankAtlantic, Mr. McClung could choose to resign within 12 months of the date of such change in control and he would be paid an amount equal to his two times his base salary in effect at the time of such resignation.

131.    Mr. McClung worked at BankAtlantic as its Chief Credit Officer from 1999 until 2004, and then as Chief Risk Officer from 2004 through the sale of BankAtlantic on July 31,

2012. After closing, Mr. McClung worked for BB&T to assist with integration through September 30, 2012.

132.    At BankAtlantic, Mr. McClung successfully led the Bank through the liquidation of two problem credit portfolios (the Leasing Portfolio and the Indirect Automobile Lending Portfolio), each of which were initiated before Mr. McClung joined BankAtlantic in 2000. During Mr. McClung's service as Chief Credit Officer there were no significant issues in the credit area and no material deficiencies noted in any Office of Thrift Supervision Examination Reports. As Chief Risk Officer, Mr. McClung successfully transformed BankAtlantic's Patriot Act (AML/BSA) departments into a model for the industry, the transformed departments received favorable comments in OTS Examination Reports, and a regulatory Order was lifted. Additionally, his responsibilities included managing Enterprise Risk Management, SOX 404 processes, Internal Audit reviews, Regulatory Compliance (including AML/BSA), and Credit Administration. Mr. McClung was also a member of the executive management team.

133.    Mr. McClung served on a number of BankAtlantic committees, including the Executive Management Council, Senior Management Group, Investment Committee, Major Loan Committee, Officers' Loan Committee, Middle Market Committee, ALCO Committee, Credit Policy Committee, Executive Compliance Committee, Non-Deposit Investment Committee, SOX404 Committee, and the Enterprise Risk Committee.

134.    Mr. McClung was never accused of any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse. He did not contribute to BankAtlantic's designation as a "troubled institution." He was never accused of any violation of federal or state laws that would impact the Bank's financial condition.

### 3.    Susan McGregor—Chief Talent Officer

135.    BBX sought to pay Ms. McGregor about $893,713 in severance, or about two times her base salary and bonus. That amount was provided for in the Stock Purchase Agreement after arm's length negotiations between BBX and BB&T.

136.    Ms. McGregor joined BankAtlantic in 1986 and became Chief Talent Officer in 2004 until the sale of BankAtlantic on July 31, 2012. She had also served as Senior Vice President, Human Resources since 1991. After closing, Ms. McGregor worked for BB&T to assist with integration through September 30, 2012.

137.    At BankAtlantic, Ms. McGregor led all human resources and training functions, including EEO/AA, talent acquisition, talent management, succession planning, payroll, compensation, and benefits. She maintained an impeccable twenty-six year record and has a sterling reputation with various government agencies she and her staff collaborated with, such as the EEOC, Broward County Human Relations Board, and Department of Labor.

138.    Ms. McGregor served on the following BankAtlantic committees: the Executive Management Council and the Senior Management Group.

139.    Ms. McGregor was never accused of any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse. She did not contribute to BankAtlantic's designation as a "troubled institution." She was never accused of any violation of federal or state laws that would impact the Bank's financial condition.

### 4.    Lewis Sarrica—Chief Investment Officer

140.    BBX sought to pay Mr. Sarrica about $920,451 in severance, or about two times his base salary and bonus. That amount was provided for in the Stock Purchase Agreement after arm's length negotiations between BBX and BB&T.

40

141.     Mr. Sarrica joined BankAtlantic in April 1986 and became Executive Vice President and Chief Investment Officer in December 1986.  He held that position until the sale of BankAtlantic on July 31, 2012. After closing, Mr. Sarrica worked for BB&T to assist with integration through September 30, 2012.

142.     At BankAtlantic, Mr. Sarrica was responsible for developing, recommending, and implementing BankAtlantic's investment strategies and monitoring its investments. The Bank's liquidity and securities portfolios were managed by Mr. Sarrica without incurring any permanent impairment charges and were liquidated by BB&T at a net gain. As Chief Investment Officer, Mr. Sarrica managed the short and long term funding needs of the Bank. He oversaw treasury management, investment portfolio management, one to four family wholesale loan acquisitions, asset/liability management, and wholesale liability acquisition. His policy initiatives for BankAtlantic's investment portfolio and the one to four family wholesale loan acquisition strategies excluded subprime and/or negative amortization mortgages. Additionally, Mr. Sarrica assisted in the deleveraging of BankAtlantic's balance sheet several years before the banking industry's 2008 liquidity crisis, which proved instrumental in BankAtlantic's ability to maintain required regulatory capital ratios. Mr. Sarrica also served as a Trustee of BankAtlantic's Discontinued Defined Benefit (Retirement) Plan and as a Trustee & Treasurer of the BankAtlantic Foundation.

143.     Mr. Sarrica served on the following BankAtlantic committees: the Executive Management Council, Senior Management Group, Investment Committee, Retirement Plan Trustees, ALCO Committee, Pricing Committee, Non-Deposit Investment Committee. He also served on the Parent Company Investment Committee for Bancorp.

144.    Mr. Sarrica was never accused of any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse. He did not contribute to BankAtlantic's designation as a "troubled institution." He was never accused of any violation of federal or state laws that would impact the Bank's financial condition.

### 5.    Valerie Toalson—Chief Financial Officer

145.    BBX sought to pay Ms. Toalson about $995,438 in severance, or about two times her base salary and bonus. That amount was provided for in the Stock Purchase Agreement after arm's length negotiations between BBX and BB&T.

146.    Ms. Toalson joined BankAtlantic in 2006 and became Chief Financial Officer of BBX Capital in mid-2007 just before the economic collapse. She remained in that role until the sale of BankAtlantic on July 31, 2012. After closing, Ms. Toalson worked for BB&T to assist with integration through October 19, 2012.

147.    Ms. Toalson's functional responsibilies at BBX Capital and BankAtlantic included Financial and Regulatory Reporting, Accounting Operations, Finance, Treasury and Investments, including ALCO, Investment, and Deposit Pricing Committees. She was responsible for monthly reports to the Board of Directors and the Audit Committee. Ms. Toalson was the primary executive contact with regulators and governmental agencies, and managed ongoing compliance and regulatory communications associated with regulatory orders and related inquiries. As part of executive management, Ms. Toalson led the efforts in:

- Designing and implementing robust modeling tools critical to executive management's ability to successfully navigate the downturn

- Strengthening balance sheet and income statement forecast processes, facilitating executive management's evaluation of strategic alternatives.

- Developing rolling capital models that provided various stress scenarios for analysis by executive management and the Board.

- Developing forward-looking risk models related to both the first and second lien mortgage portfolios that were incorporated into the allowance for loan loss evaluation and capital modeling.

148.    The only accusations of any fraudulent act or omission, federal securities law claims in a private lawsuit, were rejected by final judgment. Ms. Toalson has not been accused of any other fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse. She did not contribute to BankAtlantic's designation as a "troubled institution." She was never accused of any violation of federal or state laws that impacted the Bank's financial condition.

## D.    The FDIC Has Unreasonably Withheld or Unreasonably Delayed Approval of Contractual Severance Payments Owed to Three Former BankAtlantic Executives[9]

149.    For over five years, the banking agencies have been aware of BBX's obligation to make the severance payments as outlined in the Stock Purchase Agreement.

150.    For months, the agencies have been in possession of BBX's applications for approval to make severance payments to three former BankAtlantic executive officers.

151.    These applications are based on substantially the same record as the five applications that languished before the banking agencies for nearly 5 years before receiving any action.

152.    The FDIC and FRB have not and cannot articulate any basis for refusing to approve the payments to BankAtlantic's former executives.

153.    BBX's submissions to the FDIC and FRB demonstrated a clear and unrebutted rationale for approval of each individual executive's severance:

---

[9] BBX maintains its position that regulatory approval is not required under 12 U.S.C. § 1828 because BBX did not make any severance payment or agree to make any severance payment as an "insured depository institution or covered company."

### 1.    Alan B. Levan—Chair and Chief Executive Officer

154.    BBX sought to pay Mr. Levan about $2.1 million in severance. This amount was provided for in the Stock Purchase Agreement after arm's length negotiations between BBX and BB&T.

155.    Mr. Levan worked at BankAtlantic as its Chair and Chief Executive Officer from 1987 until the sale of BankAtlantic on July 31, 2012.

156.    At BankAtlantic, Mr. Levan was responsible for strategic planning and development and overall oversight of executive management. As part of executive management, Mr. Levan was responsible for:

- Strategic planning at BankAtlantic to reduce its balance sheet and the need for capital in the savings and loan crisis of the late 1980s and early 1990s that ensured that BankAtlantic survived when many peer institutions failed;

- Strategic planning at BankAtlantic to ensure a conservative credit culture for decades so that the Bank never originated or owned—directly or indirectly—any of the subprime, no documentation, low documentation, option-arm, negative amortization, or other high-risk residential loans made by other institutions;

- Recognizing in early 2007 the risk of devaluation in the Florida real estate market, directing resources toward a workout department in the spring of 2007, directing enhanced scrutiny of extensions by the loan committees, and directing the Bank take the largest provisions and write-downs allowable for non-performing assets;

- Directing the exploration of all strategic alternatives to preserve capital, including hiring an investment bank to explore opportunities to sell loans in the fourth quarter of 2007;

- Coordinating rights offerings and public offerings so that BBX could raise additional money and downstream it to BankAtlantic so that the Bank exceeded minimum capital ratios before its sale to BB&T; and

- Strategic planning of and coordination of the innovative auction process and transaction structure so that BankAtlantic could be sold at the highest price, minus assets undervalued by other market participants;

157.    Mr. Levan served on a number of BankAtlantic committees, including the ALCO Committee, Allowance for Loan Loss Committee, Compliance Oversight Committee, Credit

Policy Committee, Deposit Pricing Committee, Disclosure Control Committee, Enterprise Risk Committee, Executive Compliance Committee, Executive Management Council, GAAP Assessment Committee, Incentive Plan Design Committee, Investment Committee, Land Loan Committee, Major Loan Committee, Middle Market Committee, New Branch Committee, New Product Committee, New Store Committee, Non-Deposit Investment Committee, Officer Loan Committee, Parent Company Investment Committee, Pricing Committee, Retirement Plan Trustees, Senior Loan Discussion Group, Senior Management Group, SOX Committee, Talent Management Committee, Technology Steering Committee.

158.    A federal jury cleared Alan Levan of any wrongdoing in connection with the baseless allegations that he violated the federal securities laws. In the ten years since BankAtlantic began taking substantial loan loss provisions, no one has ever alleged a criminal violation or a material violation of banking law that had a material effect on BankAtlantic's financial condition.

### 2.    John ("Jack") Abdo—Vice Chair

159.    BBX sought to pay Mr. Abdo about $2.1 million in severance. This amount was provided for in the Stock Purchase Agreement after arm's length negotiations between BBX and BB&T.

160.    Mr. Abdo worked at BankAtlantic as its Vice Chair from 1987 until the sale of BankAtlantic on July 31, 2012.

161.    At BankAtlantic, Mr. Abdo was responsible for strategic planning and development and overall oversight of executive management. As part of executive management, Mr. Abdo was responsible for:

- Strategic planning at BankAtlantic to reduce its balance sheet and the need for capital in the savings and loan crisis of the late 1980s and early 1990s that ensured that BankAtlantic survived when many peer institutions failed;

45

- Strategic planning at BankAtlantic to ensure a conservative credit culture for decades so that the Bank never originated or owned—directly or indirectly—any of the subprime, no documentation, low documentation, option-arm, negative amortization, or other high-risk residential loans made by other institutions;

- Recognizing in early 2007 the risk of devaluation in the Florida real estate market, directing resources toward a workout department in the spring of 2007, directing enhanced scrutiny of extensions by the loan committees, and directing the Bank take the largest provisions and write-downs allowable for non-performing assets;

- Directing the exploration of all strategic alternatives to preserve capital, including hiring an investment bank to explore opportunities to sell loans in the fourth quarter of 2007;

- Coordinating rights offerings and public offerings so that BBX could raise additional money and downstream it to BankAtlantic so that the Bank exceeded minimum capital ratios before its sale to BB&T; and

- Strategic planning of and coordination of the innovative auction process and transaction structure so that BankAtlantic could be sold at the highest price, minus assets undervalued by other market participants;

162.    Mr. Abdo served on a number of BankAtlantic committees, including the Investment Committee, Land Loan Committee, Major Loan Committee, and Retirement Plan Trustees.

163.    The only accusations of any fraudulent act or omission, federal securities law claims in a private lawsuit, were rejected by final judgment. Mr. Abdo has not been accused of any other fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse. He did not contribute to BankAtlantic's designation as a "troubled institution." He was never accused of any violation of federal or state laws that impacted the Bank's financial condition.

### 3.    Jarett S. Levan—Chief Executive Officer

164.    BBX sought to pay Mr. Levan about $1.4 million in severance. This amount was provided for in the Stock Purchase Agreement after arm's length negotiations between BBX and BB&T.

165.    Mr. Levan worked at BankAtlantic in various roles from 1998 until the sale of BankAtlantic on July 31, 2012.

166.    At BankAtlantic, Mr. Levan's responsibilities were focused principally on marketing, the branch network, and gathering low-cost deposits. His roles and responsibilities included:

- After graduating from the University of Miami Law School, in 1998, he worked in the legal department including in the review of contracts for purchasing additional store locations and addressing the labor and employment issues raised by thousands of BankAtlantic employees working in its branches;

- In 1999, he was a BankAtlantic director and President of BankAtlantic.com, the Bank's internet solution for customers that included online banking and online bill pay;

- In 2001, he was President of Alternative Delivery for BankAtlantic, which included the online banking platform, the call center, and ATM channels;

- In 2002, he was Chief Marketing Officer and was responsible for marketing strategy, the marketing budget, the development of a free checking/free gift program, and a seven-day banking strategy that included expanded hours in physical locations and a call center available 24 hours a day, 7 days a week;

- In 2007, he was President of BankAtlantic, CEO of BankAtlantic, and President of BBX with all of the departments and projects mentioned in Items 1-4 rolling up to him. He was responsible—directly and indirectly—for gathering and servicing billions of dollars of deposits. At its peak, BankAtlantic's retail business had over 100 branches and approximately 3,000 employees;

- During his tenure, BankAtlantic received the Cutting Edge award from the Greater Miami Chamber of Commerce for its deposit-gathering strategies and the JD Power Award in 2010 for retail banking customer satisfaction in the state of Florida;

- BankAtlantic's average deposit per customer was about $4,000, far below the FDIC insured limits, which provided additional protection against liquidity risks that might jeopardize deposits and the insurance fund;

- In large part due to its low-cost deposit basis, BankAtlantic maintained high capital ratios and presented no risk to its depositors or the FDIC. BankAtlantic's cost of deposits was 2.13% in 2007 and 0.40% in 2011, the last fiscal year before BankAtlantic's sale to BB&T. And in that same year BankAtlantic's liquidity as a percentage of deposits was 36.7%;

- In August 2010, BankAtlantic's strong retail network enabled it to seek a buyer for its 19 branches located in Tampa. BankAtlantic then agreed to sell to PNC those Tampa branches, two related facilities, and the associated deposits of over $324 million at a 10 percent deposit premium. This sale reduced costs, increased profitability, and shrank BankAtlantic's balance sheet, all in support of stronger capital; and

- In November 2011, BB&T agreed to buy BankAtlantic in an unassisted transaction in large part because of the Bank's strong retail network, and, in the transaction that closed the following year, paid a 10% deposit premium.

167.    Mr. Levan served on a number of BankAtlantic committees, including the ALCO Committee, Allowance for Loan Loss Committee, Compliance Oversight Committee, Credit Policy Committee, Deposit Pricing Committee, Disclosure Control Committee, Enterprise Risk Committee, Executive Compliance Committee, Executive Management Council, GAAP Assessment Committee, Incentive Plan Design Committee, Investment Committee, Land Loan Committee, Major Loan Committee, Middle Market Committee, New Branch Committee, New Product Committee, New Store Committee, Non-Deposit Investment Committee, Officer Loan Committee, Pricing Committee, Retirement Plan Trustees, Senior Loan Discussion Group, Senior Management Group, SOX Committee, Talent Management Committee, and Technology Steering Committee.

168.    Mr. Levan was never accused of any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse. He did not contribute to BankAtlantic's designation as a "troubled institution." He was never accused of any violation of federal or state laws that would impact the Bank's financial condition.

### COUNT I—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
#### Unlawful Final Determination (5 U.S.C. §§ 704, 706(2))
#### (against the FDIC)

169.    Plaintiff BBX re-alleges paragraphs 1 through 168.

170.     The FDIC's determination that the severance payments are "golden parachute" payments," are "prohibited forever," and therefore require regulatory approval constitutes final agency action reviewable under § 704 and § 706 of the Administrative Procedure Act.

171.     BBX has suffered a legal wrong due to the FDIC's action, and is therefore entitled to judicial review. Because of the FDIC's erroneous golden parachute determination, BBX is unable to comply with its contractual obligations to pay severance to former BankAtlantic executives, and is unable to pursue reimbursement to which it is contractually entitled. BBX's reputation and ability to attract and retain talent has also been damaged.

172.     BBX has no other adequate remedy in court.

173.     The FDIC's final determination is arbitrary, capricious, and contrary to law because it is inconsistent with the text, structure, and purpose of the statute governing "golden parachute payments." The FDIC also failed to consider relevant factors including, but not limited to, the fact BBX was not a "covered institution" or "an insured depository institution."

174.     WHEREFORE, BBX requests an order, pursuant to 5 U.S.C. § 706(2), setting aside the FDIC's unlawful determination that the severance payments were subject to the "golden parachute" regulations.

### COUNT II—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
#### Unlawful Final Determination (5 U.S.C. §§ 704, 706(2))
#### (against the FDIC and FRB)

175.     Plaintiff BBX re-alleges paragraphs 1 through 168.

176.     The FDIC and FRB have refused to approve BBX's request to pay the full severance amounts provided for in the Stock Purchase Agreement. Those determinations constitute final agency action reviewable under § 704 and § 706 of the Administrative Procedure Act.

177.     BBX has suffered a legal wrong due to the banking agencies' action, and is therefore entitled to judicial review. Because of the FDIC's erroneous determination, BBX is unable to comply with its contractual obligations to pay severance to former BankAtlantic executives, and is unable to pursue reimbursement to which it is contractually entitled. BBX's reputation and ability to attract and retain talent has also been damaged.

178.     BBX has no other adequate remedy in court.

179.     The banking agencies' final determination is arbitrary, capricious, and contrary to law because it is inconsistent with the text, structure, and purpose of the statute governing "golden parachute payments" and inconsistent with the record before the agency. The FDIC also failed to consider relevant factors including, but not limited to, the lack of any fraudulent act or omission and the lack of any material violation of any application banking law.

180.     WHEREFORE, BBX requests an order, pursuant to 5 U.S.C. § 706(2), setting aside the unlawful determination that it will not approve BBX's application to pay the full severance amounts provided in the Stock Purchase Agreement.

### COUNT III—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Unlawfully Withholding or Unreasonably Delaying Agency Action (5 U.S.C. § 706(1)) (against the FDIC and the FRB)

181.     Plaintiff BBX re-alleges paragraphs 1 through 168.

182.     Pursuant to the Federal Deposit Insurance Act, 12 U.S.C. § 1828(k), the FDIC is charged with regulatory authority over "golden parachute" payments. Specifically, a covered entity cannot make such payments without prior supervisory approval from the appropriate federal banking agency—in this case the FRB—and the written concurrence of the FDIC. *See* 12 C.F.R. § 359.4(a)(1).

183.    Congress did not specifically prescribe a timeline for approval or denial of a proposed payment, but agencies must act "within a reasonable time." 5 U.S.C. § 555(b). This Court is authorized to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

184.    On September 16, 2013, BBX submitted to the banking agencies initial applications for approval of severance payments to Valerie C. Toalson, Lloyd B. DeVaux, Jay C. McClung, Susan D. McGregor, and Lewis F. Sarrica.

185.    On July 26, 2017, BBX submitted to the banking agencies additional applications for approval of severance payments to Alan Levan, John Abdo, and Jarett Levan. Those applications are based on substantially the same record as the applications BBX submitted in 2013.

186.    The FDIC and FRB were required to render a decision on the applications by virtue of their erroneous determination that the payments constitute "golden parachute" payments, which by statute require regulatory approval.

187.    The FDIC and FRB have yet to approve or deny the applications and have failed to articulate any basis for their failure to act.

188.    The FDIC's and FRB's failure to make a determination on BBX's severance applications constitutes agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

189.    WHEREFORE, BBX requests an order, pursuant to 5 U.S.C. § 706(1), compelling the FDIC and FRB to make a finding on BBX's Application for Approval/Consent of Severance Payments by a date certain.

## COUNT IV—DUE PROCESS VIOLATIONS
### (against the FDIC and the FRB)

190.    Plaintiff BBX re-alleges paragraphs 1 through 168.

191.    The Due Process Clause of the Fifth Amendment to the United States Constitution provides: "No person shall be . . . deprived of life, liberty, or property, without due process of law."

192.    Protectable property and liberty interests exist with respect to the severance payments that BBX is contractually required to make. Among other things, BBX has an interest in complying with its legal obligations, receiving reimbursement as required under the governing contract, as well as maintaining its reputation and ability to attract and retain talent. BankAtlantic's executives, to whom substantial severance sums are owed, have monetary and reputational interests at stake. There is a legitimate claim of entitlement to the interests at issue.

193.    The banking agencies have deprived constitutionally protected property and liberty interests by erroneously concluding that a second approval process is required for BBX to receive reimbursement from BB&T as contractually required.

194.    The banking agencies have not articulated any justification for their erroneous position and have not provided a hearing of any kind during the over 4 years that the applications for approval were pending.

195.    WHEREFORE, BBX demands judgment against Defendants for violation of due process.

## COUNT V—DECLARATORY RELIEF
### (against the FDIC and the FRB)

196.     Plaintiff BBX re-alleges paragraphs 1 through 168.

197.     An actual, present, and justiciable controversy has arisen between BBX, the FDIC, and the FRB concerning BBX's contractual duty to pay severance to former BankAtlantic executives.

198.     Absent declaratory relief, BBX could be exposed to legal liability for its failure to pay contractually required severance payments and the loss of contractually bargained for rights. BBX's reputation and ability to attract and retain talent has also been damaged.

199.     BBX's contractually required severance payments have been delayed solely because of the FDIC's unreasonable determination that the payments must be approved and the FDIC's and FRB's unreasonable refusal to grant approval.

200.     WHEREFORE, BBX seeks a declaration that it is authorized to make the contractually required severance payments.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(A)     Setting aside the FDIC's unlawful determination that the severance payments constitute "golden parachute" payments requiring regulatory approval;

(B)     Declaring that BBX is authorized to make the contractually required severance payments;

WHEREFORE, in the alternative, Plaintiff demands judgment against Defendants as follows:

(A)     Declaring that the Defendants have violated the Administrative Procedure Act by arbitrarily and capriciously refusing approve the full severance payments provided for under the Stock Purchase Agreement;

(B)     Declaring that Defendants have violated the Administrative Procedure Act by failing to issue written reasons for granting or denying the severance applications of Alan Levan, John Abdo, and Jarett Levan;

(C)     Declaring that Defendants have violated the Due Process Clause by erroneously concluding that a second approval process is required for BBX to obtain reimbursement for any approved payments; and

(D)     Granting such other and further relief as the Court may deem just and proper.

Date:  March 15, 2018                    Respectfully submitted,

                                         STEARNS WEAVER MILLER WEISSLER
                                         ALHADEFF & SITTERSON, P.A.


                                         By:   /s/ Grace L. Mead_____

                                              EUGENE E. STEARNS
                                              Florida Bar No. 0149335
                                              estearns@stearnsweaver.com
                                              GRACE L. MEAD
                                              Florida Bar No. 49896
                                              gmead@stearnsweaver.com
                                              JENEA M. REED
                                              Florida Bar No. 84599
                                              jreed@stearnsweaver.com
                                              Museum Tower
                                              150 West Flagler Street
                                              Suite 2200
                                              Miami, Florida 33130
                                              Telephone: (305) 789-3200

                                              *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of March 2018, I filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via CM/ECF or via email.

                                     /s/ Jenea M. Reed
                                     JENEA M. REED

## SERVICE LIST

*BBX Capital Corporation v. Federal Deposit Insurance Corp., et al*
Case No. 0:17-cv-62317-JIC
United States District Court, Southern District of Florida


Erik Bond
erbond@fdic.gov
Sarah E. Faust
sfaust@fdic.gov
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive, D-7026
Arlington, VA 22226
*Attorneys for Federal Deposit Insurance Corp.*


Joshua P. Chadwick
joshua.p.chadwick@frb.gov
Christopher J. Becker
Christopher.j.becker@frb.gov
Board of Governors of the Federal Reserve System
20th & C Streets, N.W.
Washington, D.C., 20551
*Attorney for Board of Governors of the Federal Reserve System*