# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:17-cv-62317-JIC

BBX CAPITAL CORPORATION, formerly BankAtlantic
Bancorp, Inc.,

        Plaintiff,

vs.

FEDERAL DEPOSIT INSURANCE CORP., in its
corporate capacity, and BOARD OF GOVERNORS OF
THE FEDERAL RESERVE BOARD

        Defendants.

_____/


# BBX CAPITAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND
# INCORPORATED MEMORANDUM OF LAW

Eugene E. Stearns
Grace L. Mead
Jenea M. Reed
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................. 1

THE ADMINISTRATIVE DECISIONS ..................................................................... 6

THE LEGAL STANDARD ........................................................................................ 7

    I.     The Golden Parachute Statute and Regulations. .......................................... 7

    II.    Summary Judgment and the Administrative Procedure Act ......................... 9

BBX IS ENTITLED TO SUMMARY JUDGMENT ................................................. 11

    I.     The Proposed Payments Are Not "Golden Parachute Payments," as Defined by the Statute. .................................................................................. 11

    II.    The Agencies' Conclusion that the Golden Parachute Regulations Preclude Payments In Excess of One Year's Salary Is Arbitrary and Capricious. ..................... 13

    III.   The Agencies Arbitrarily and Capriciously Reduced the Amounts of the Proposed Severance Payments and Failed to Consider Critical Evidence. ................. 15

    IV.   The Agencies' Decision to Require A Second Approval Process, Without Explanation, Is Arbitrary and Capricious. ................................................... 18

    V.    The Agencies Have Unlawfully Deprived BBX of Property Without Due Process. ...................................................................................................... 18

    VI.   The Federal Reserve Board Has Unreasonably Delayed Agency Action. ................... 19

CONCLUSION ..................................................................................................... 19

CERTIFICATE OF SERVICE ................................................................................ 21

SERVICE LIST .................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*American Petroleum Tankers Parent, LLC v. U.S.*,
    952 F. Supp. 2d 252 (D.D.C. 2013) ......................................................................9

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng'rs*,
    833 F.3d 1274 (11th Cir. 2016) ...........................................................................9

*Bonilla v. Baker Concrete Constr.*,
    487 F.3d 1340 (11th Cir. 2007) .........................................................................14

*Bradley v. Sebelius*,
    621 F.3d 1330 (11th Cir. 2010) ................................................................... 10, 13

*Brinklys v. Johnson*,
    175 F. Supp. 3d 1338 (M.D. Fla. 2016),
    *aff'd sub nom. Brinklys v. Sec'y, Dep't of Homeland Sec.*,
    702 F. App'x 856 (11th Cir. 2017) .......................................................................9

*Brock v. Roadway Express, Inc.*,
    481 U.S. 252 (1987) ...........................................................................................18

*Christensen v. Harris Cnty.*,
    529 U.S. 576 (2000) ................................................................................... 10, 14

*Citizens to Pres. Overton Park v. Volpe*,
    401 U.S. 402 (1971) .............................................................................................9

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ...........................................................................................10

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) ...........................................................................................10

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ...........................................................................................18

*Genuine Parts Co. v. Envtl. Prot. Agency*,
    890 F.3d 304 (D.C. Cir. 2018) ......................................................................9, 15

*Goss v. Lopez*,
    419 U.S. 565 (1975) ...........................................................................................18

*Green v. Bock Laundry Mach. Co.*,
    490 U.S. 504 (1989) ...........................................................................................13

*Grosjean v. Am. Press Co.*,
   297 U.S. 233 (1936) ............................................................................................................18

*Hagan v. Comm'r of Social Sec.*,
   694 F.3d 287 (3d Cir. 2012) ............................................................................................15

*Harrison v. Ocean Bank*,
   No. 10-cv-20085, 2010 WL 11579961 (S.D. Fla. July 23, 2010) ....................................18

*Milavetz, Gallop & Millavetz, P.A. v. U.S.*,
   559 U.S. 229 (2010) ........................................................................................................13

*Morall v. D.E.A.*,
   412 F.3d 165 (D.C. Cir. 2005) ........................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Cas. Ins. Co.*,
   463 U.S. 29 (1983) ..........................................................................................................15

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ..........................................................................................................19

*Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*,
   788 F.2d 705 (11th Cir. 1986) ..........................................................................................9

*Rosales-Garcia v. Holland*,
   322 F.3d 386 (6th Cir. 2003) ..........................................................................................15

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................................................18

*Sierra Club v. U.S. Army Corps of Eng'rs.*,
   295 F.3d 1209 (11th Cir. 2002) ........................................................................................9

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................................10, 14, 15

*UPMC Mercy v. Sebelius*,
   793 F. Supp. 2d 62 (D.D.C. 2011) ..............................................................................9, 10

*Wisconsin v. Constantineau*,
   400 U.S. 433 (1971) ........................................................................................................18

**Statutes**

12 U.S.C. § 1828 ............................................................................................6, 8, 11, 12

5 U.S.C. § 555 ..................................................................................................................19

5 U.S.C. § 706 ..............................................................................................................9, 19

**Regulations**

12 C.F.R. § 359.4 .................................................................................................................passim

Plaintiff BBX moves for entry of summary judgment that will allow it to meet contractual obligations to former senior executives notwithstanding decisions to the contrary by the FDIC and FRB that are, without genuine issues of material fact, arbitrary and capricious. In support thereof, BBX submits the following memorandum:[1]

## INTRODUCTION

BBX was, until 2012 a savings bank holding company, which owned a federally insured savings bank—BankAtlantic. In 2012, BBX and BB&T closed on the sale of BankAtlantic, triggering financial obligations to the executives under that Stock Purchase Agreement. The FDIC and FRB wrongly determined that the agreements to be honored by an unregulated entity—BBX ceased to be a bank holding company upon the sale—were "golden parachutes" with benefits subject to regulatory review and approval. BBX sought that approval after reserving its objection to the Agencies' regulatory authority. Years later, the Agencies arbitrarily and capriciously determined that only about half of the bargained-for contractual benefits could be paid for five executives and have yet to reach a final determination for three executives. This litigation ensued.

To overrule agency action this Court must be satisfied, based on the administrative record, the decision by the FDIC and FRB was arbitrary and capricious. It was.

The conduct of the executives in service of BankAtlantic and BBX spanned four periods: (i) the years prior to December 31, 2006, when lending decisions were made in what was

---

[1] References to "BBX" are to BBX Capital Corporation, formerly BankAtlantic Bancorp, Inc., which is the former holding company of BankAtlantic the Bank; references to FDIC are to the Federal Deposit Insurance Corporation; references to "FRB" are to the Board of Governors of the Federal Reserve System; references to the "Agencies" are to the FDIC and FRB collectively; references to "SUF ¶ __" are to the accompanying BBX's Statement of Undisputed Facts; references to "DE __" are to documents filed and entered on the court docket; references to "Ex. __" are to the exhibits attached to the accompanying, Plaintiff BBX's Statement of Undisputed Facts. Emphasis is added and citations are omitted unless otherwise indicated.

1

believed to be a robust real estate market; (ii) the period from January 1, 2007 to August 9, 2007, during which the real estate market went from troubled to the brink of collapse; (iii) the period from August 10, 2007 to October 2008, which began with the collapse of credit markets and ended with the collapse of Lehman and AIG and subsequent bailout; and (iv) the years of the Great Recession, ending with the sale of BankAtlantic to BB&T. The accompanying Statement of Undisputed Facts and its exhibits show:

During the first period (before December 31, 2006), the administrative record establishes that BankAtlantic's executive officers conducted themselves with the highest degree of professionalism, employed conservative lending practices, and avoided entirely the kinds of risky lending decisions that, made by others, led the banking system two years later to the edge of collapse. Long before the world learned of distress in condominium lending, BankAtlantic exited the business altogether. When other institutions reported small and large fortunes on subprime mortgage loans and mortgage-backed securities, BankAtlantic stayed out of those investments entirely, believing them to be reckless. Nonetheless, by early 2006 BankAtlantic began to shrink all real estate lending. Indeed, the Office of Thrift Supervision (OTS), which was the federal entity with supervisory authority over the bank, concluded in 2006 that "BankAtlantic is financially sound and prudently operated by an experienced executive management team," "loans were prudently underwritten," and "[t]he real estate portfolio is diversified and there are no concentrations that give cause for supervisory concern at this time." There is no evidence to the contrary.

During the second period (January 1, 2007 to August 9, 2007), as market conditions worsened, BankAtlantic's senior executives took a hard line toward any additional lending secured by real estate, and internally established aggressive loan monitoring programs driven by

fear that the market was deteriorating. During that same period, the senior officers of the FRB and Treasury provided public statements far more optimistic about the economy and real estate than believed by BankAtlantic's executives. In its public filings, BBX became an outlier in the banking sector, expressing grave concern about the condition of real estate markets and the potential impact on the future creditworthiness of borrowers tied to real estate investments. BBX's expression of concern was particularly noteworthy, as it had not invested in the kinds of risky loans that had created the market uncertainty. In all of its securities filings, BBX expressed concern to the market that loans good when made would cease to be good loans if market conditions worsened. The administrative record is devoid of factual dispute. No banking executives did a better job of doing the right thing during this period.

During the third period (August 10, 2007 until October 2008), BBX and BankAtlantic executives again performed within the highest standards expected of executives of federally insured financial institutions. The market driven circumstances were dire. On August 9, 2007, without warning, worldwide credit markets suddenly and completely collapsed. Extremely knowledgeable real estate lenders, the executives immediately understood what this meant to the real estate industry and immediately took the steps necessary to meet the two critically important obligations imposed under the circumstances. The first goal was to maximize efforts to reduce or eliminate real estate loan losses, an effort simplified by the fact that earlier in the year all preparations for this circumstance had been undertaken. The second goal was to inform investors about the extent of the problem caused by the credit market crash. That required an immediate evaluation of the likely impact of devaluation of real estate assets on BankAtlantic loans.

In October 2007, BBX was one of the first—if not the first—financial institution to advise the public of the market crash and the losses those market conditions would likely cause. Being an industry leader in these difficult times was not rewarded.[2]

By bucking the silence, BBX and BankAtlantic executives established a standard of competent and honest conduct unequaled by any others. By timely reporting market driven losses in conventional loans while most others pretended that all was well, BBX was subject to criticism based simply on market ignorance of the collapse that had already happened but was being ignored by most competitors and, for some reason, by the banking regulators.[3]

In the quarters that followed BBX's recognition of market driven loan losses in its real estate portfolio, one by one the dominos fell—Bear Stearns, Countrywide, Merrill Lynch, IndyMac, BankUnited and others either closed or were forced into mergers. Only then was the depth of the problem finally disclosed. Reckless subprime mortgages and securities had bankrupted the entire banking system. Federal officials announced that, absent a massive infusion of federal dollars, the system would collapse. The bailout was underway. BankAtlantic did not take a penny.

In the fourth period—the Great Recession—BBX and BankAtlantic executives navigated the companies successfully through the worst economic circumstances since the Great

---

[2] The FDIC and FRB rely on an examination report published during the time the real estate market was in a free fall. That report was critical of the very same loans that when made in an earlier period had been determined by regulators to have been prudently underwritten. What later made the loans vulnerable to loss were the suddenly changing economic conditions. In fact, no loan secured by Florida real estate, whenever made, was immune from loss caused by insane subprime mortgage originations and securitizations.

[3] By being among the few to timely report on the consequences of the market collapse, BBX appeared as an outlier. It was immediately sued in private securities lawsuits by plaintiffs comparing BBX's stock performance with companies that concealed the problems for an extended time. It prevailed in the private litigation. It was then sued by the SEC. It prevailed in that litigation as well.

Depression. In addition to doing so without government assistance, BankAtlantic weathered the collapse in value of its real estate assets while never failing to exceed federal capital standards.

The sale of BankAtlantic to BB&T Corporation closed on July 31, 2012. It did not involve any government funds, and did not result in any loss to the FDIC's Deposit Insurance Fund. In that sale, BBX exited the banking industry entirely and its executive managers were entitled by contract to receive severance payments as part of the negotiated transaction with BB&T, if and only if the sale was approved by the Agencies and closed. It did.

About six years after the sale of the bank, the Agencies have arbitrarily and capriciously refused to approve the full, contractually bargained for amounts of the severance payments. Erroneously classifying the required severance payments as "golden parachute payments"— BBX was not a "covered company" within the statutory definition of "golden parachute payments" —the Agencies ordered BBX to submit applications for regulatory approval of the payments. BBX promptly did so in 2013 as to five of its former executives. BBX addressed the required regulatory factors for each executive and demonstrated that none prohibited the required severance payments. *See* 12 C.F.R. § 359.4(a)(4). What followed were years of inaction and delay by the Agencies, punctuated with periodic requests for responses. The five applications languished, without any hint of a decision, for over four years, despite overwhelming evidence that the contractually required severance payments furthered the intent of the governing statute.

Frustrated with the inaction, BBX filed this suit.

While this litigation was pending, the FDIC issued final agency actions, concluding that it would not approve the full bargained for payments and instead would arbitrarily limit the severance payments to one year's salary for each of the five executives. The FRB concurred.

As explained in more detail below, BBX was entitled to make severance payments to its

former executives after the closing of the unassisted transaction with BB&T that removed BBX from the banking industry altogether. The golden parachute statute and regulations do not apply to a non-banking entity under these circumstances, and the Agencies do not and cannot articulate any rational basis for doing so. Nonetheless, even if the payments could be properly characterized as "golden parachute payments" in contravention of the statute, the Agencies' decision to substantially limit the contractually bargained for payments is unsupported by the regulatory text or the record submitted to the Agencies. These decisions are arbitrary and capricious in violation of the Administrative Procedure Act (APA) and violate BBX's due process rights. Moreover, the FRB's refusal to render a decision on three additional pending applications constitutes unlawfully withheld or unreasonably delayed agency action in further violation of the APA.

## THE ADMINISTRATIVE DECISIONS

At issue under the APA's "arbitrary and capricious" review are four separate agency determinations regarding contractually required severance payments to former BankAtlantic executives. Each is a final agency action reviewable under the APA.

*First*, the FDIC erroneously and repeatedly concluded that the contractually required payments by BBX to former BankAtlantic executives were "golden parachute" payments that required regulatory approval by the FDIC and FRB. As explained below, such a conclusion is inconsistent with the statutory definition of "golden parachute payment," which is "any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party. . . ." 12 U.S.C. § 1828(k). BBX is not and was not a covered company at the time its contractual payment obligations arose.

*Second*, the FDIC and FRB erroneously concluded that 12 C.F.R. § 359.4(a)(1) does not

permit payments in excess of twelve months salary. As explained below, that conclusion is unsupported by the text of the golden parachute regulations, and also directly contradicts prior agency guidance. It also leads to absurd results that cannot be justified by the purpose or text of the golden parachute statute and regulations.

*Third*, the FDIC and FRB erroneously concluded that payments to five executives, who they admit performed admirably in the face of a "protracted national economic downturn," should be limited to the amount of their salary in 2011. As explained below, that conclusion is the definition of arbitrary and capricious in light of the record before the Agencies.

*Fourth*, the FDIC and FRB erroneously concluded, without explanation, that an additional agency review process must be completed before BB&T can reimburse any payments made by BBX that have already been approved by the Agencies. As there is no explanation for this conclusion, it should be overturned. In addition to violating the APA, the Agencies' erroneous imposition of a second review process also deprives BBX of due process regarding legally protectable interests.

Separately, BBX also seeks judgment on its agency delay claim against the FRB for failure to render decisions on three additional applications that remain pending, with no timetable for decision.[4]

## THE LEGAL STANDARD

## I.     The Golden Parachute Statute and Regulations

The central purpose of the banking agencies is to protect bank depositors and ensure the

---

[4] BBX's amended complaint asserted an agency delay against both the FRB and the FDIC. Days before dispositive briefing was due, the FDIC issued three letters purporting to be final agency action on the three applications that had been outstanding for more than a year. The FRB, however, continues to unreasonably withhold and delay agency action. Rather than supplement its complaint to reflect these new developments now, BBX reserves the right to later supplement the complaint or bring a separate lawsuit regarding the three applications on behalf of Alan Levan, John Abdo, and Jarett Levan.

safety and soundness of the banking system. After the savings and loan crisis of the late 1980s, Congress passed a number of statutes that gave the banking agencies more regulatory authority to address fraud and insider abuse, which had been a primary contributing factor to the rampant epidemic of bank failures during the crisis. Among those statutes was the so-called "golden parachute" statute that authorized the FDIC to limit or prevent certain severance payments by "troubled" institutions. *See* 12 U.S.C. § 1828(k). The statute by its terms applies only to payments "by any insured depository institution or covered company." 12 U.S.C. § 1828(k)(4)(A).

The statute was designed to prevent windfall payments to individuals that had contributed to a financial institution's decline. Indeed, the text and legislative history of the golden parachute statute reflect Congress's stated desire to curtail insider abuse and fraud. The statutory text identifies a number of factors for consideration regarding proposed "golden parachute" payments, including, whether the proposed recipient "committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse," was "substantially responsible" for the financial institution's troubled condition, or "violated any applicable Federal or State banking law or regulation." 12 U.S.C. § 1828(k)(2)(A)-(C). The FDIC promulgated regulations adopting these factors, and requiring proposed recipients to address them. *See* 12 C.F.R. § 359.4(a)(4).

If a payment is properly categorized as a "golden parachute" payment, the regulations specifically provide for regulatory approval of three categories of permissible payments, only two of which are applicable here. *See* 12 C.F.R. § 359.4(a)(1), (3). Under the so-called "change-in-control" provision, an insured depository institution is permitted to make a "reasonable severance payment, not to exceed twelve months salary, . . . in the event of a change in control of the insured depository institution." 12 C.F.R. § 359.4(a)(3). A separate provision, referred to as the "regulator's concurrence," permits a payment if "[t]he appropriate federal banking agency, with the

written concurrence of the [FDIC] determines that such a payment or agreement is permissible." 12 C.F.R. § 359.4(a)(1). The latter provision does not cap the payment amount. *See id.*

## II.     Summary Judgment and the Administrative Procedure Act

Under the APA, a court may review and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Court's review must be based on the whole record that was before the Agencies at the time the decision was made, including all materials that might have influenced the agency's decision. *See Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *American Petroleum Tankers Parent, LLC v. U.S.*, 952 F. Supp. 2d 252, 260 (D.D.C. 2013). This Court must focus on whether the Agencies' conclusions are "rational and reasonably explained." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir. 2016). There must be a "rational connection between the facts found and the choice made." *Sierra Club v. U.S. Army Corps of Eng'rs.*, 295 F.3d 1209, 1216 (11th Cir. 2002). Although the arbitrary and capricious standard is deferential to the Agencies, courts are not permitted to "rubber stamp" an agency's decision, particularly when evidence in the administrative record substantially undercuts the Agencies' decision. *Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*, 788 F.2d 705, 708 (11th Cir. 1986); *see Genuine Parts Co. v. Envtl. Prot. Agency*, 890 F.3d 304, 312 (D.C. Cir. 2018).

Summary judgment is the appropriate vehicle for this Court to determine whether agency action is arbitrary and capricious. *See, e.g., Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1349-50 (M.D. Fla. 2016), *aff'd sub nom. Brinklys v. Sec'y, Dep't of Homeland Sec.*, 702 F. App'x 856 (11th Cir. 2017); *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011). Under the APA, however, the familiar summary judgment standard gives way to the court's function as an appellate tribunal, and the case is decided not on undisputed facts, but as a matter of law. The

ultimate question for the Court's resolution is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *UPMC Mercy*, 793 F. Supp. 2d at 67.

Although an agency's construction of a statute it administers is generally entitled to *Chevron* deference, the unambiguously stated intent of Congress must be given effect. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). To the extent that a statute is silent or ambiguous with respect to an issue, the question for the court to decide is whether the agency's interpretation is "based on a permissible construction of the statute." *Id.* An administrative agency's "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). An agency's interpretation in such informal guidance instead receives more-limited *Skidmore* deference—it is "entitled to respect," "but only to the extent that those interpretations have the 'power to persuade.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, the particular persuasive force afforded to an agency's informal interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade. . . ." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991). Applying *Skidmore* deference, courts have rejected informal agency guidance where the position it reflects is "unsupported by the statutory language . . . and its attending regulations." *Bradley v. Sebelius*, 621 F.3d 1330, 1338 (11th Cir. 2010); *see also Christensen*, 529 U.S. at 587.

## BBX IS ENTITLED TO SUMMARY JUDGMENT

**I.      The Proposed Payments Are Not "Golden Parachute Payments," as Defined by the Statute.**

Congress vested the FDIC with the authority to "prohibit or limit, by regulation or order, any golden parachute payment." 12 U.S.C. § 1828(k)(1). By its terms, statutory authority exists only over payments that fall within the definition provided by Congress. Congress defined "golden parachute payments" to include:

> [A]ny payment (or an agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or covered company that is contingent on the termination of such party's affiliation with the institution or covered company and is received on or after the date on which the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition.

12 U.S.C. § 1828(k)(4).

BBX's obligation to pay severance to certain former executives arose only after the closing of the sale of BankAtlantic to BB&T. *See* DE 24-1. As explained in BBX's applications submitted to the Agencies, BBX had no obligation to pay any severance unless and until conditions to closing were satisfied and the transaction closed.[5] When the transaction closed, BBX ceased being a "covered company," which is statutorily defined as "any depository holding company . . . or any other company that controls an insured depository institution." 12 U.S.C. § 1828(k)(5)(D). It is undisputed that BBX sold its entire interest in BankAtlantic, the only depository institution it ever owned, and as of July 31, 2012 was not a covered company within the meaning of the golden parachute statute.

Nevertheless, months after BBX had completely exited the banking business, the FDIC

---

[5] That conclusion was expressly supported by the Stock Purchase Agreement, which BBX provided to the agencies. It stated "*At the Closing*, Seller shall assume and be responsible for the [severance] payment[s]." DE 24-1 at 34.

erroneously concluded that the post-closing payments were "golden parachute payments," without addressing whether BBX was a "covered company." Ex. 1, AR000684; SUF ¶¶ 31-32. After BBX continued to press its challenge to the FDIC's golden parachute determination, the FDIC subsequently concluded that BBX "is subject to regulation under Section 1828(k) and Part 359 as a 'covered company' for purposes of the payment[s]." Ex. 1, AR001281; *see also* SUF ¶¶ 50-56. Yet it offered no rational connection to the facts to support its conclusion, and indeed its purported justifications did not address the key issue—whether BBX was a covered company at the time its contractual obligations arose.

The FDIC stated, "[a]t the time the [Stock Purchase Agreement] became effective, Bancorp and the Bank were in 'troubled condition' and each was a 'covered company.'" Ex. 1, AR001281; *see also* SUF ¶¶ 50-56. That statement, however, ignores the language of the Stock Purchase Agreement, which provided that BBX was not obligated to assume the payments *unless and until the sales transaction closed*, when BBX undisputedly was not a covered company. The FDIC went on to express its policy concern that "executives of troubled banks [would] receive windfall payments merely because their institutions became so troubled that they ceased to exist 'in present form'." Ex. 1, AR001281. That concern, however, was belied by the record here, where the FDIC itself noted that "the Bank was acquired in an unassisted transaction without loss to the FDIC's Deposit Insurance Fund or taxpayer funds." Ex. 1, AR001285. Finally, the FDIC noted its "long-standing practice and statutory interpretation" that "[o]nce a severance payment satisfies the conditions for classification as a golden parachute, it retains its golden parachute status . . . forever." Ex. 1, AR001294. That statement, too, misses the mark because it fails to recognize that the payments never satisfied a necessary condition precedent for classification as a golden parachute payment—a payment or an agreement to make any payment by a "covered company."

The FDIC's argument that covered payments would be prohibited "forever," derived from the preamble of its regulations, fails for an independent reason—it would lead to absurd results. As the Supreme Court has explained, courts should reject a statutory interpretation that would produce an absurd result. *See, e.g., Milavetz, Gallop & Millavetz, P.A. v. U.S.*, 559 U.S. 229, 252 (2010); *see also Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring); *Bradley*, 621 F.3d at 1338. Under the FDIC's construction of the statute, it would prohibit a healthy acquirer from paying or reimbursing severance to executives who assisted in preserving the value of an institution in troubled condition and selling it in an unassisted transaction. It would similarly prohibit a bank or other covered company from rewarding executives who assist in resurrecting an institution from its designation as "troubled." Such a construction is inconsistent with Congress's desire to focus on avoiding rewards to individuals who materially contribute to the troubled condition of a financial institution. Indeed, it would have the opposite effect by barring companies from rewarding the executives who save a financial institution.

The severance payments here do not fall within the ambit of "golden parachute payments." The FDIC's contrary conclusion should be set aside because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## II.     The Agencies' Conclusion that the Golden Parachute Regulations Preclude Payments In Excess of One Year's Salary Is Arbitrary and Capricious.

As explained at pp. 7-9, above, the golden parachute regulations provide three independent categories of permissible payments by an insured depository institution. *See* 12 C.F.R. § 359.4(a)(1)-(3). The FDIC purported to analyze BBX's applications under two of the three categories—the "change-in-control" provision and the "regulator's concurrence" provision. Citing the regulatory text, the FDIC concluded that under the "change-in-control" provision, only

a payment in the amount of twelve months salary was permissible under 12 C.F.R. § 359.4(a)(3). Indeed, that specific limitation appears directly in the text of the applicable regulation, which provides for a "reasonable severance payment, *not to exceed twelve months salary* . . . in the event of a change in control of the insured depository institution." *Id.* The agency then separately concluded that a payment in excess of twelve months salary generally "should" not be approved under the "regulator's concurrence" provision. *See* 12 C.F.R. § 359.4(a)(1). Knowing that the twelve-month limitation appears nowhere in the regulatory text of subsection (a)(1), the FDIC instead pointed to "Guidance on Golden Parachute Applications," FDIC FIL 66-2010, which it claims supports the imposition of a twelve-month limitation under subsection (a)(1). It cites this interpretive guidance for the proposition that the FDIC lacks "broad latitude to approve golden parachute agreements allowing payments in excess of twelve months' salary" under the "regulator's concurrence" provision. The FRB accepted that conclusion without analysis. *See* Ex. 2, FRB-AR-001218. That interpretation, however, is inconsistent with the regulatory text as well as independent guidance from the FDIC.

As the Supreme Court has repeatedly held, informal agency interpretations, such as the one relied on by the FDIC, do not warrant heightened deference. *Christensen*, 529 U.S. at 587; *see also Bonilla v. Baker Concrete Constr.*, 487 F.3d 1340 (11th Cir. 2007) (applying *Skidmore* deference). Here, the FDIC interprets its regulation to impose a time limitation that does not exist in the text of the regulation. Indeed, the FRB, in reviewing the FDIC's conclusion, noted that the "regulators' concurrence" provision, "permits approval of any golden parachute payments without limit on amount." Ex. 2, FRB-AR-001220. If the regulation was intended to be limited to twelve months salary, it plainly could have been drafted with an express limitation, as was done under the "change-in-control" exception.

14

Putting aside these fundamental interpretive problems, the agency's conclusion also contradicts its own guidance in another agency publication. The FDIC's Manual of Examination Policies expressly contemplates separate, independent review for requests to make payments in excess of 12 months salary. It states: "Any requests for payments in excess of this amount (12 months salary) would have to be considered for approval under the general case-by-case exception." DE 24-10. That statement suggests that, contrary to the FDIC's assertion, no categorical ban or limitation exists on payments in excess of twelve months salary. When an agency has asserted inconsistent interpretations of a regulation, its interpretations are less persuasive, and entitled to very limited deference. *See Hagan v. Comm'r of Social Sec.*, 694 F.3d 287, 304 (3d Cir. 2012); *Rosales-Garcia v. Holland*, 322 F.3d 386, 403 n.22 (6th Cir. 2003).

## III.    The Agencies Arbitrarily and Capriciously Reduced the Amounts of the Proposed Severance Payments and Failed to Consider Critical Evidence.

The Agencies' decision also must be reversed as arbitrary and capricious because it ignored altogether evidence that the governing regulation required it to consider. "An agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts*, 890 F.3d at 312. An "agency action is arbitrary and capricious when, *inter alia*, the agency has entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Cas. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Agencies failed to address or even acknowledge critical factors that are required to be addressed in all "golden parachute" applications. The regulation governing "permissible golden parachute payments" specifically provides that an applicant "shall demonstrate" that is not aware of anything suggesting that the proposed recipient "has committed any fraudulent act

15

or omission, breach of trust or fiduciary duty or insider abuse," "is substantially responsible" for the bank's troubled condition or "has materially violated any applicable federal or state banking law or regulation." 12 C.F.R. § 359.4(4).

BBX painstakingly addressed each of these factors in its initial and July 13, 2017 supplemental submissions to the Agencies. SUF ¶¶ 1-15, 40-61. In the supplemental submission after the SEC verdict, BBX summarized publicly-available information from examination reports, BBX's SEC filings, and the trial record from SEC litigation that had recently been resolved in favor of BBX. Ex. 1, AR001266-1279. The additional disclosures established that in the SEC litigation a federal jury expressly rejected the SEC's allegations of securities fraud related to BBX's disclosures about and accounting for loans in 2007. Ex. 1, AR001266-1279. In its supplemental application, BBX advised the FDIC of this important development and summarized key parts of the trial record including: (1) the litigation revealed that, like many other financial institutions in Florida, BankAtlantic's "troubled" status resulted entirely from the systemic collapse of the Florida real estate market, (2) the record established that—far from committing securities fraud—BBX was the first to disclose the risk and effects of devaluation of the Florida real estate market, and (3) the record established that BankAtlantic's management set the standard among Florida banks for prudent underwriting, managing credit risk, and managing capital. Ex. 1, AR001266-1279. The Agencies did not address these critical points, including the lack of fraudulent acts, omissions, or insider abuse, and the lack of any reasonable basis to conclude that management materially violated the law.

While the administrative record includes an erroneous summary judgment reversed on appeal, in an earlier memorandum the Agencies disclaim any reliance upon it and instead concede that they credited the July 13, 2017 submission. The FRB took the position that "both

agencies did directly or indirectly consider the July 13, 2017 letter," which summarized the reversal of that summary judgment and the record underlying the subsequent jury verdict rejecting every claim asserted. DE 37 at 7. The FDIC conceded that, in considering the reversed summary judgment order, "[t]here is no need to supplement the record" and "BBX is free to cite [the Eleventh Circuit] opinion, without the need to put that document in the record." DE 36 at 8. The FDIC also took the position that "the FDIC's final determination letters credit BBX's representations and make no mention of the SEC Litigation" and "[t]o the extent BBX believes the FDIC's final determinations overlook some aspect of the SEC Litigation, BBX is free to raise such arguments during briefing on the merits." DE 36 at 6, 8. This leaves the Agencies with no basis to oppose BBX's summary of the events during this period.

As explained above, the critical issue and central concern underlying the "golden parachute" regulations is to prevent those that engage in fraud and insider abuse from profiting from a bank's failure or troubled condition. Here, the Agencies ignored the fact that all Florida institutions were troubled by being in a troubled market but some survived the trouble by good— here exemplary—management, untainted by any of the hallmarks the statutory and regulatory regime was designed to address.

The DC Circuit has reversed an agency decision as "utterly arbitrary and capricious" where it was "stunningly one-sided in its focus" by failing "to consider contradictory record evidence where such evidence is precisely on point." *Morall v. D.E.A.*, 412 F.3d 165, 167 (D.C. Cir. 2005). That same result is required here.[6]

---

[6] The Agencies also concluded that they would approve payments only in the amount of each executive's 2011 salary, but the Agencies did not provide any basis for arbitrarily selecting 2011 as the appropriate year to determine salary. The FDIC specifically requested each executive's compensation data for the *three years* prior to transaction with BB&T (2009-2012), which BBX

**IV.     The Agencies' Decision to Require A Second Approval Process, Without Explanation, Is Arbitrary and Capricious.**

Agencies must "articulate a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 513 (2009). Absent such an explanation, the court must vacate the decision and remand to the agency, because courts cannot "supply [their] own reasoned basis for the agency's decision that was not given by the agency itself." *Harrison v. Ocean Bank*, No. 10-cv-20085, 2010 WL 11579961 *5 (S.D. Fla. July 23, 2010) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Here, the Agencies have stated, without explanation, that a second review process would be required if BB&T reimburses BBX for any of the payments that have already been partially approved. *E.g.*, Ex. 1, AR 001281. This conclusion, which is not supported by any statutory or regulatory text, is particularly unreasonable given that the partially approved applications have been before the Agencies for almost 5 years.

**V.     The Agencies Have Unlawfully Deprived BBX of Property Without Due Process.**

Corporations possess due process rights under the U.S. Constitution, and cannot be deprived of property or liberty without due process of law. *See, e,g.*, *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936). Protected property interests can arise from a contract. *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260-61 (1987). Protected liberty interests are broadly construed and can encompass damage to "good name, reputation, honor, or integrity." *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *see also Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). BBX has identified multiple protected interests, including its interest in complying with its legal obligations to pay severance to former executives, its interest in being reimbursed for those payments as required by contract, and its executive officers' interests in receiving compensation long past due for exemplary service before and during the Great Recession. The

---

provided. And BBX advised the agencies that the executives' salaries were substantially reduced, beginning in January 2011, as part of a voluntary reduction in pay by all executive management.

actions and erroneous conclusions of the Agencies, as described above, have unlawfully deprived BBX and its current and former executive officers of those legally protected interests.

## VI.   The Federal Reserve Board Has Unreasonably Delayed Agency Action.

Under the APA, this Court is empowered to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706. Although Congress did not specify a timeframe, the Agencies are required to act "within a reasonable time." 5 U.S.C. § 555(b). A claim for agency delay requires that the agency has unreasonably failed to take a discrete action it is legally required to make. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).[7]

Here, agency action is legally required to act in light of the Agencies' erroneous determination that the proposed payments are "golden parachute payments," which require regulatory approval. The discrete agency action at issue is a simple determination by the FRB regarding the status of three applications for severance that have been pending before the Agencies for more than a year. The FRB's inaction is even more unreasonable because the pending applications are based on substantially the same record as five applications that were pending before the Agencies since 2013 and were recently, albeit only partially, approved. The FRB has yet to act on the outstanding three applications and has failed to provide any basis for its failure to act. Nor has it articulated any timetable for a response. BBX is not seeking to have the court require a specific course of conduct. Rather, BBX seeks a decision, whatever it might be, such that it can proceed with the next steps required to resolve these three long outstanding severance obligations.

## CONCLUSION

BBX respectfully asks the Court to enter summary judgment for BBX.

---

[7] BBX originally asserted a delay claim against both the FDIC and the FRB. The FDIC, however, recently issued final determinations regarding the pending applications.

Date:   August 30, 2018               Respectfully submitted,

                                      STEARNS WEAVER MILLER WEISSLER
                                      ALHADEFF & SITTERSON, P.A.


                                      By:   /s/ Jenea M. Reed

                                            EUGENE E. STEARNS
                                            Florida Bar No. 0149335
                                            estearns@stearnsweaver.com
                                            GRACE L. MEAD
                                            Florida Bar No. 49896
                                            gmead@stearnsweaver.com
                                            JENEA M. REED
                                            Florida Bar No. 84599
                                            jreed@stearnsweaver.com
                                            Museum Tower
                                            150 West Flagler Street
                                            Suite 2200
                                            Miami, Florida 33130
                                            Telephone: (305) 789-3200

                                            *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of August 2018, I filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via CM/ECF or via email.

<div style="margin-left: 50%;">

/s/ Jenea M. Reed
JENEA M. REED

</div>

## SERVICE LIST

*BBX Capital Corporation v. Federal Deposit Insurance Corp., et al*
Case No. 0:17-cv-62317-JIC
United States District Court, Southern District of Florida


Erik Bond
erbond@fdic.gov
Sarah E. Faust
sfaust@fdic.gov
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive, D-7026
Arlington, VA 22226
*Attorneys for Federal Deposit Insurance Corp.*


Joshua P. Chadwick
joshua.p.chadwick@frb.gov
Christopher J. Becker
christopher.j.becker@frb.gov
Board of Governors of the Federal Reserve System
20th & C Streets, N.W.
Washington, D.C., 20551
*Attorney for Board of Governors of the Federal Reserve System*

22