**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 0:17-cv-62317-JIC

BBX CAPITAL CORPORATION, formerly BankAtlantic
Bancorp, Inc.,

       Plaintiff,

vs.

FEDERAL DEPOSIT INSURANCE CORP., in its
corporate capacity, and BOARD OF GOVERNORS OF
THE FEDERAL RESERVE BOARD

       Defendants.

_____/

**BBX CAPITAL CORPORATION'S STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Eugene E. Stearns
Grace L. Mead
Jenea M. Reed
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

Page

A.   BBX and BankAtlantic's History in the Banking Industry ........................................... 1

B.   BBX Exits the Banking Industry................................................................................. 4

C.   BBX's Contractual Obligations to Pay Severance to Former Executives ..................... 5

D.   The FDIC's Classification of the Severance Payments as "Golden Parachute" Payments ................................................................................................................... 6

E.   BBX Submits Applications to Make Severance Payments to Five Former Executives ................................................................................................................... 6

F.   BBX Supplements its Initial Applications to Pay Severance ....................................... 8

G.   BBX Submits Applications to Pay Severance to Three Additional Executives ............. 8

H.   The Agencies Issue Final Decisions on Five of the Pending Applications, While Three Applications Remain Pending Before the FRB ........................................ 9

**A.      BBX and BankAtlantic's History in the Banking Industry**

1.      Prior to July 31, 2012, BBX Capital Corporation owned a banking subsidiary, known as BankAtlantic, which was one of the largest community banks headquartered in Florida. DE 24 ¶¶ 3, 10; DE 29 ¶¶ 3, 10.[1]

2.      BankAtlantic's success was in part attributable to its ability to attract and retain high-quality executive managers, who were skilled at navigating the good and bad times that were inevitable in the banking business. Management made sound lending decisions, including complete avoidance of the subprime, low-documentation, and no-documentation loans that would eventually precipitate the financial crisis. Ex. 1, AR001268.

3.      Long before the world learned of distress in condominium lending, BankAtlantic exited the business altogether, never suffering a loss. Ex. 2, FRB-AR-000069.

4.      Since the 1980s, BankAtlantic built a reputation as a conservative financial institution. Examination Reports, undertaken during the time that BankAtlantic's commercial loans were underwritten and booked, lauded the institution and its executives for adherence to conservative investment and lending practices. Indeed, the Office of Thrift Supervision (OTS), which was the federal entity with supervisory authority over the bank, concluded in 2006 that "BankAtlantic is financially sound and prudently operated by an experienced executive management team," "loans were prudently underwritten," and "[t]he real estate portfolio is diversified and there are no concentrations that give cause for supervisory concern at this time."

---

[1] "BBX" refers to BBX Capital Corporation, formerly known as BankAtlantic Bancorp, Inc., which was the bank holding company that owned all of the stock of BankAtlantic. "BB&T" refers to BB&T Corporation, which purchased BankAtlantic from BBX. The Federal Deposit Insurance Corporation is referred to as the "FDIC," the Federal Reserve Board of Governors as the "FRB," and the FDIC and FRB collectively as "the Agencies." References to "DE __" are to documents filed and entered on the court docket. References to Ex. ___ are to the Exhibits attached to this Statement of Undisputed Facts in Support of BBX's Motion for Summary Judgment.

Ex. 1, AR001269; Ex. 2, FRB-AR-00006-07 & 13.

5.      In the years leading up to 2007, BankAtlantic's management had warned that "a slowdown in the real estate market was likely," and accordingly management had taken various underwriting and risk management precautions, which the OTS deemed satisfactory. Ex. 1, AR001269; Ex. 2, FRB-AR-000070-73.

6.      By early 2006, BankAtlantic began to shrink all real estate lending. Ex. 2, FRB-AR-000069.

7.      From January 1, 2007 to August 9, 2007, as market conditions worsened, BankAtlantic's senior executives took a hard line toward any additional lending secured by real estate and internally established aggressive loan monitoring programs driven from by that the market was deteriorating. Ex. 1, AR001269.

8.      From January 1, 2007 to August 9, 2007, the senior officers of the FRB and Treasury provided public statements far more optimistic about the economy and real estate than believed by BankAtlantic's executives. Ex. 1, AR001269.

9.      From January 1, 2007 to August 9, 2007, in its public filings, BBX became an outlier in the banking sector, expressing grave concern about the condition of real estate markets and the potential impact on the future creditworthiness of borrowers tied to real estate investments. Ex. 1, AR001269.

10.      But no one could have foreseen the magnitude of the sudden collapse of the real estate market that hit Florida particularly hard in 2007. On August 9, 2007, the French bank BNP Paribas "froze millions of dollars in funds citing subprime mortgage concerns," causing interbank borrowing costs to rise dramatically. DE 24 ¶ 95; DE 29 ¶ 95. This unprecedented market crash was followed immediately by a collapse of the housing market. Ex. 1, AR001268 &

AR001271.

11.     Accordingly, BankAtlantic re-assessed the value of the collateral for its commercial real estate loans, aggressively wrote down loans, and ultimately on October 25, 2007, for the quarter that ended September 30, 2007, reported a $29.6 million loss driven by the market conditions. DE 24 ¶ 97; DE 29 ¶ 97. As it had done in the years preceding the crash, BBX continued to warn investors about the difficult times that were ahead.  Ex. 1, AR001268.

12.     In October 2007, BBX was one of the first—if not the first—financial institutions to advise the public of the market crash and the losses those market conditions would likely cause. Ex. 1, AR001271.

13.     BBX's timely disclosure and conservative loss recognition (while others remained silent) exposed BankAtlantic to attacks from private litigants alleging securities fraud. The SEC also initiated an investigation and enforcement action. As discussed in more detail below, both the private litigation and the SEC litigation would be resolved in favor of BBX and its executives. Ex. 1, AR001268 & AR001271; *see also SEC v. BankAtlantic Bancorp, Inc. et al.*, No. 12-cv-60082, DE 625 (S.D. Fla. May 8, 2017).

14.     After the third quarter of 2007, many of BankAtlantic's Florida peers, including Bank of Florida, BankUnited, Seacoast Bank, and TIB Bank, whose portfolios were similarly tied to the Florida real estate market, underreported their losses in the third quarter of 2007, and in comparison, made BankAtlantic's significant third-quarter loss appear to be an outlier. Ex. 1, AR001268 & AR001274-75. Bank of Florida and Bank United subsequently failed and were placed into receivership, at a significant loss to the FDIC's Deposit Insurance Fund. *See* DE 24 ¶ 120; DE 29 ¶ 120.

15.     The true magnitude of the financial crisis was not revealed until fall of 2008.

Many banks were able to survive only with assistance from the federal government. BankAtlantic survived without taking a penny of federal assistance. DE 24 ¶¶ 79-80; DE 29 ¶¶ 79-80.

16.     From 2008 until 2012, BankAtlantic made changes to its balance sheet in response to economic conditions, secured a buyer for certain branches, and received valuable capital infusions from its parent company BBX. DE 24 ¶¶ 100-101; DE 29 ¶¶ 100-101.

17.     In its 2010 Report of Examination, OTS designated BankAtlantic as a "troubled institution." That same report stated that "liquidity levels are regarded as adequate," that BBX's "compliance structure includes the components of an effective compliance process," and "management and the board of directors are responsive to supervisory concerns and have generally demonstrated appropriate oversight of the bank's operations." Ex. 1, AR000061 & AR001272-73; Ex. 2, FRB-AR-000314, 333, 353.

18.     Despite the dire market conditions, BankAtlantic always met federal capital standards. Ex. 1, AR001273.

19.     Multiple financial institutions received federal TARP assistance or FDIC loss-share assistance. DE 24 ¶¶ 121; DE 29 ¶¶ 121. BankAtlantic was not one of them. Ex. 1, AR001275.

**B.     BBX Exits the Banking Industry**

20.     In the summer of 2011, BankAtlantic management expressed its belief that Florida real estate values would soon begin to rebound. They also maintained their confidence in the quality of their loan portfolio. Ex. 1, AR001273.

21.     On November 1, 2011, BBX entered into an agreement with BB&T in which BB&T purchased the stock of BankAtlantic, while BBX retained $600 million of BankAtlantic's written down non-performing assets. DE 24-1.

22.     On July 31, 2012 the sale of BankAtlantic to BB&T closed, with the approval of the FDIC and FRB. DE 29 ¶ 46; Ex. 1, AR000658; Ex. 2, FRB-AR-000671.

23.     BBX's sale of BankAtlantic to BB&T did not involve any government funds. BBX shareholders received a deposit premium of about 10 percent. DE 29 ¶¶ 16, 113.

24.     Since the closing of the sale of BankAtlantic, BBX no longer accepts bank deposits. DE 24 ¶ 114; DE 29 ¶ 114.

**C.     BBX's Contractual Obligations to Pay Severance to Former Executives**

25.     The Stock Purchase Agreement between BB&T Corporation and BankAtlantic Bancorp, Inc. dated November 1, 2011, as amended, provided for the severance payments if and only if the sale closed and further provided in Section 5.7:

> At the Closing, Seller shall assume and be responsible for the payment of the obligations of the Bank or any Affiliate to pay to the individuals listed on Schedule 5.7(h) hereto the amounts set forth opposite their names on such schedule. Seller shall make all applicable Tax withholdings and file all forms reporting such payments to the appropriate Governmental Authority. Such payments made by Seller shall comply with Section 409A of the Code. Purchase shall reimburse Seller for all amounts paid pursuant Schedule 5.7(h), without duplication for any amount credited to Seller on the Closing Balance Sheet pursuant to the Bank Accounting Principles or otherwise.

DE 24-1.

26.     It specified severance payment amounts for the following former BankAtlantic Executives: John Abdo ($2,123,194), Lloyd DeVaux ($1,319,114), Lewis Sarrica ($920,451), Alan Levan ($2,145,179), Jarrett Levan ($1,413,764), Susan McGregor ($893,713), Jay McClung ($743,258), and Valerie Toalson ($995,438). Ex. 1, AR000644; Ex. 2 FRB-AR-000568.

27.     Jay McClung's 1999 employment agreement provided for the payment of severance. Ex. 1, AR000819 & AR001277.

28.     Lloyd DeVaux's 2001 employment agreement provided for the payment of

severance. Ex. 1, AR000790 & AR001277.

29.     Prior to the closing of the sale, on April 18, 2012, counsel for BBX provided information to the FDIC concerning the sale of BankAtlantic, including the agreements referenced in ¶¶ 19-22, above. DE 24 ¶ 42; DE 29 ¶ 42.

30.     BBX's obligation to pay the severance payments arose upon and, in the Stock Purchase Agreement, was conditioned upon the closing of the sale of BankAtlantic to BB&T. DE 24 ¶ 3; DE 29 ¶ 3.

**D.     The FDIC's Classification of the Severance Payments as "Golden Parachute" Payments**

31.     In an April 4, 2013 letter to BB&T and BBX, the FDIC stated that the payments required by the Stock Purchase Agreement would constitute "golden parachute payments" and would require submission of applications for regulatory approval. Ex. 1, AR000682-88.

32.     The April 4, 2013 letter stated: "If this payment is prohibited under the prescribed circumstances, it is prohibited forever." Ex. 1, AR000686.

**E.     BBX Submits Applications to Make Severance Payments to Five Former Executives**

33.     On September 16, 2013, BBX submitted applications to make severance payments to five former BankAtlantic executive officers—Chief Financial Officer Valerie C. Toalson, Chief Operating Officer Lloyd B. DeVaux, Chief Risk Officer Jay C. McClung, Chief Talent Officer Susan D. McGregor, and Chief Investment Officer Lewis F. Sarrica. Ex.1, AR000719-727; Ex. 2, FRB-AR-000698-738.

34.     BBX's September 16, 2013 applications disputed the FDIC's classification of the payments as "golden parachute" payments. *E.g.*, Ex. 1, AR000719.

35.     BBX sought to pay Mr. Lloyd DeVaux about $1.3 million in severance. Mr. DeVaux worked at BankAtlantic as its Chief Information Officer from 2001 to 2004 and as its

6

Chief Operating Officer from 2004 until the sale of BankAtlantic on July 31, 2012. After closing, Mr. DeVaux worked for BB&T to assist with integration through October 25, 2012. DE 24 ¶¶ 125-126; DE 29 ¶¶ 125-126.

36.     BBX sought to pay Mr. Jay McClung about $743,258 in severance. Mr. McClung worked at BankAtlantic as its Chief Credit Officer from 1999 until 2004, and then as Chief Risk Officer from 2004 through the sale of BankAtlantic on July 31, 2012. After closing, Mr. McClung worked for BB&T to assist with integration through September 30, 2012. DE 24 ¶¶ 130-131; DE 29 ¶¶ 130-131.

37.     BBX sought to pay Ms. Susan McGregor about $893,713 in severance. Ms. McGregor joined BankAtlantic in 1986 and served as Chief Talent Officer from 2004 until the sale of BankAtlantic on July 31, 2012. She had also served as Senior Vice President, Human Resources since 1991. After closing, Ms. McGregor worked for BB&T to assist with integration through September 30, 2012. DE 24 ¶¶ 135-136; DE 29 ¶¶ 135-136.

38.     BBX sought to pay Mr. Lewis Sarrica about $920,451 in severance. Mr. Sarrica joined BankAtlantic in April 1986 and became Executive Vice President and Chief Investment Officer in December 1986.  He held that position until the sale of BankAtlantic on July 31, 2012. After closing, Mr. Sarrica worked for BB&T to assist with integration through September 30, 2012. DE 24 ¶¶ 140-141; DE 29 ¶¶ 140-141.

39.     BBX sought to pay Ms. Valerie Toalson about $995,438 in severance. Ms. Toalson joined BankAtlantic in 2006 and became Chief Financial Officer of BBX Capital in mid-2007 just before the economic collapse. She remained in that role until the sale of BankAtlantic on July 31, 2012. After closing, Ms. Toalson worked for BB&T to assist with integration through October 19, 2012. DE 24 ¶¶ 145-146; DE 29 ¶¶ 145-146.

**F.      BBX Supplements its Initial Applications to Pay Severance**

40.      On February 4, 2014 the FDIC wrote to BBX to request supplemental information regarding each of the five executives. *E.g*, Ex. 1, AR000772; Ex. 2 FRB-AR-000745.

41.      On March 7, 2014, BBX submitted supplemental information to the FDIC and FRB regarding each of the five executives. E.g., Ex. 1, AR000779; Ex. 2, FRB-AR-000754.

42.      On July 13, 2017, BBX submitted an additional supplement to the applications to pay severance to the five executives. Ex. 1, AR001266-79; Ex. 2, FRB-AR-001162-75.

43.      The supplement detailed new developments, including the favorable resolution of the SEC litigation in favor of BBX and Alan Levan, the jury's rejection of every claim asserted by the SEC, and key findings from the trial record regarding BankAtlantic's disclosure of risks long before its peers. Ex. 1, AR001266-79; Ex. 2, FRB-AR-001162-75.

44.      "With the additional information provided, [the FDIC] consider[ed] the application[s] complete." *E.g.*, Ex.1, AR001280.

**G.      BBX Submits Applications to Pay Severance to Three Additional Executives**

45.      On July 26, 2017, BBX submitted applications to pay severance to its three highest-ranking directors and officers—Alan Levan, John E. Abdo, and Jarett Levan. DE 29 ¶ 63; Exs. 3-5.

46.      BBX sought to pay Alan Levan about $2.1 million in severance. Mr. Levan worked at BankAtlantic as its Chair and Chief Executive Officer from 1987 until the sale of BankAtlantic on July 31, 2012, and was responsible for strategic planning and development and overall oversight of executive management at BankAtlantic. DE 24 ¶¶ 154-156; DE 29 ¶¶ 154-156. A federal jury found that Alan Levan was not liable for securities violations. DE 24 ¶ 158; DE 29 ¶ 158; *see also SEC v. BankAtlantic Bancorp, Inc. et al.*, No. 12-cv-60082, DE 624 (S.D. Fla. May 8, 2017)

47.     BBX sought to pay John Abdo about $2.1 million in severance. Mr. Abdo worked at BankAtlantic as its Vice Chair from 1987 until the sale of BankAtlantic on July 31, 2012, and was responsible for strategic planning and development and overall oversight of executive management. DE 24 ¶¶ 159-161; DE 29 ¶¶ 159-161.

48.     BBX sought to pay Jarett Levan about $1.4 million in severance. Mr. Levan worked at BankAtlantic in various roles from 1998 until the sale of BankAtlantic on July 31, 2012, including marketing and the branch network. DE 24 ¶¶ 164-166; DE 29 ¶¶ 164-166.

49.     Each of the three applications contained information regarding compensation history, job performance, and committee participation, which the Agencies had previously requested in reference to the other prior five pending applications.  DE 24 ¶ 64; DE 29 ¶ 64.

**H.     The Agencies Issue Final Decisions on Five of the Pending Applications, While Three Applications Remain Pending Before the FRB**

50.     On January 31, 2018, the FDIC issued final agency action on the five severance applications that BBX had initially submitted on September 26, 2013. DE 24 ¶ 69; DE 29 ¶ 69.

51.     In its January 31, 2018 letters, the FDIC again concluded that the payments were subject to the "golden parachute" regulations. *E.g.*, Ex. 1, AR001280.

52.     The FDIC's January 31, 2018 letters stated that the FDIC analyzed the applications under two provisions it deemed applicable: the "Change-in-Control" provision (12 C.F.R. § 359.4(a)(3)) and the "Regulator's Concurrence" provision (12 C.F.R. § 359.4(a)(1)). *E.g.*, Ex. 1, AR001283.

53.     For each of the five executives, the FDIC stated it "would not concur in payment . . . in any amount above one year's salary." The FDIC cited the executives' salary in 2011, "[their] last full year of employment."  *E.g.*, Ex. 1, AR001280 & AR001284.

54.     The FDIC's Manual of Examination Policies states "Any requests for payments in

excess of this amount (12 months' salary) would have to be considered for approval under the general case-by-case exception." DE 24-10 § 4.1-13.

55.     The "approved" amounts constituted a substantial reduction compared to the amounts stated in the Stock Purchase Agreement. DE 24 ¶ 70; DE 29 ¶ 70.

56.     The FDIC conducted an investigation into the SEC Litigation. DE 36 at 6. It considered, among other things, an interlocutory summary judgment order entered by the Southern District of Florida in the SEC litigation against BBX and Alan Levan. Ex. 1, AR000689-718; DE 31 (document no. 21); DE 36 at 6.

57.     The five executive officers whose applications were submitted on September 26, 2013, were not parties to the SEC litigation. *See* Ex.1, AR000689.

58.     On February 13, 2018, the FRB sent a letter to BBX concurring in the amounts approved by the FDIC for the five executives. Ex. 2, FRB-AR-001241.

59.     The FRB accepted the FDIC's conclusions regarding the applicability of the golden parachute regulations and the imposition of a payment limitation of one year's salary. Ex. 2, FRB-AR-001220 & AR001227-28.

60.     The FRB further concluded "there is no reason for the Board to take action on the [five] applications to the extent they seek approval for these additional payment amounts [in excess of 12 months' salary], as they were mooted by the FDIC's decision." Ex. 2, FRB-AR-001238.

61.     The three applications for Alan Levan, John Abdo, and Jarett Levan remain pending before the FRB, and no final agency action has been taken.

10

Date:   August 30, 2018                            Respectfully submitted,

                                                   STEARNS WEAVER MILLER WEISSLER
                                                   ALHADEFF & SITTERSON, P.A.


                                                   By:   */s/* Jenea M. Reed

                                                         EUGENE E. STEARNS
                                                         Florida Bar No. 0149335
                                                         estearns@stearnsweaver.com
                                                         GRACE L. MEAD
                                                         Florida Bar No. 49896
                                                         gmead@stearnsweaver.com
                                                         JENEA M. REED
                                                         Florida Bar No. 84599
                                                         jreed@stearnsweaver.com
                                                         Museum Tower
                                                         150 West Flagler Street
                                                         Suite 2200
                                                         Miami, Florida 33130
                                                         Telephone: (305) 789-3200

                                                         *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of August 2018, I filed the foregoing document with

the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served

this day on all counsel of record identified on the attached Service List via CM/ECF or via email.


        /s/ Jenea M. Reed
        JENEA M. REED

**SERVICE LIST**

*BBX Capital Corporation v. Federal Deposit Insurance Corp., et al*
Case No. 0:17-cv-62317-JIC
United States District Court, Southern District of Florida

Erik Bond
erbond@fdic.gov
Sarah E. Faust
sfaust@fdic.gov
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive, D-7026
Arlington, VA 22226
*Attorneys for Federal Deposit Insurance Corp.*

Joshua P. Chadwick
joshua.p.chadwick@frb.gov
Christopher J. Becker
Christopher.j.becker@frb.gov
Board of Governors of the Federal Reserve System
20th & C Streets, N.W.
Washington, D.C., 20551
*Attorney for Board of Governors of the Federal Reserve System*

13